**AMERICAN NAT. INS. CO. v. CASSTEVENS. (No. 12138.)**

Court of Civil Appeals of Texas. Fort Worth. April 20, 1929.

Rehearing Denied May 18, 1929.

Slay, Simon & Shannon, of Fort Worth, for appellant.

Simpson & Collins and Leo Brewster, all of Fort Worth, for appellee.

CONNER, C. J. This appeal is from a judgment in appellee's favor upon a life insurance policy naming appellee as beneficiary. Among other things not thought necessary to detail, the policy provided that in the event the death of the insured occurred as the result of bodily injuries effected exclusively and wholly by violent and external means, the defendant would pay $2,000 to the beneficiary. The issuance of the policy, its terms, proof of death of the insured, etc., were all proven. The only material question presented by appellant's propositions germane to its assignments of error is whether the evidence supports the trial court's finding that the death of the insured, George Cecil Casstevens, was "caused by bodily injury, effected exclusively and wholly by external, violent and accidental means."

A Mrs. Stephens testified, in substance, that while driving her car she attempted to stop for a signal at the intersection of two streets in Fort Worth and killed her engine; that appellee, George Cecil Casstevens, the insured, came to her assistance and she told him that the starter on the car was locked; that in attempting to crank the car he struck his hand and turned faint and held on to the car; that she asked him what had happened, and he said that he had cut his hand and that it had made him deathly sick; that Dr. Mullenix was called and treated his wound.

R. E. Tipps, a brother-in-law of the insured, testified that the day after the injury was said to have occurred he saw the insured and that his thumb and finger were bandaged up; that prior to the injury of insured's hand his physical condition was good; that he observed no boils or anything else the matter with him; that he again saw insured about a week later; that he then had his hand bandaged up and it was still swollen and looked a little red along the back of his hand and along up his arm, and that he held his hand up much of the time and was complaining with the back of his neck, and that he then had something like a boil coming on the back of his neck and shoulder; that the part of his neck of which he complained was on the right side, the same side as the hand he had hurt; that at this time he was also complaining of his hand and did not eat much; that he seemed to be feeling pretty bad; that witness again saw insured the next evening, and his hand was still swollen, and he was complaining of his neck giving him trouble; that his hand and arm were pretty red and he was carrying his hand up; that witness asked him why he was carrying his hand up, and he replied that it hurt and throbbed when he let it down; that on the Monday following, the insured, together with Dr. Nifong, went to the Southwestern Hospital, where he died a few days thereafter.

A brother of the insured, A. B. Casstevens,

testified substantially as did the witness Tipps.

Dr. H. D. Nifong testified that he was a physician and surgeon; that he had graduated from the State University and the Fort Worth Medical College; that he was in France 18 months during the recent war in a base hospital having an estimated capacity of 2,000 beds and where gassed and wounded soldiers were treated; that it was his business to constantly observe patients that came in the hospital; that they had thousands of cases of "septicemia"; that he had known the insured ever since he was born and treated him prior to his death for some five days; that upon being called to attend upon him he was told, in answer to inquiry, that insured had a week or ten days before hurt his hand and was suffering intensely with his neck; that upon first seeing him witness saw that he was desperately sick; that he examined his neck and found a small localized abscess or boil on the right side, and found his temperature to be 104; that when he first saw insured he was so sick that mention was not made of his accident; that when he saw him the next day he examined his hand, but paid little attention to it, as he was so "desperately sick"; that he again saw him the next day, and his temperature was getting higher and he complained more and more of intense pain in his neck and the swelling was getting greater; that he had a chill; two chills in less than eight or ten hours, his temperature rising to 105, and at his suggestion insured was taken to the hospital; that at the hospital Dr. Frank Beall was called in consultation, a blood test was taken, and it was found that insured's case was one of true "septicemia," or pus in the blood; that his temperature and the swelling increased materially, and after giving him an anesthetic he operated on his neck, made a large incision, but did not find any pus, but that it bled freely.

We quote the following from Dr. Nifong's testimony:

"Beyond all question of a doubt, it was septicemia that caused his death; that is what is commonly called blood poison, if you want to use that term. That is what it is in every day language—blood poison or infection of the blood stream.

"I examined this boy's hand on Saturday afternoon, but I did not pay any attention to that the first time he came to see me because he was so desperately sick; for that reason I did not pay any attention to his hand the first time he came to see me; then later on, they called my attention to his hand and I re-dressed it; I have forgotten whether there was one finger or two fingers cut; I found a dry scab on the wound and some pus underneath the scab; that is, there was localized pus under this scab.

"I certainly did reach a conclusion as to

what caused the septicemia; from the history of his case, I am positive the septicemia must have been caused by the local injury. I could see nothing else that could cause it, except the injury on his hand.

"If a man gets an infection in his hand, by what we call the lymphatic circulation, it goes right to his arm, and by localized infection, it could cause rigidity of the neck; it certainly does do that. Everybody has had that experience, I guess.

"When I said I did not pay any attention to his hand, I meant that the infection had gotten up higher, and he was complaining and his hand was of such minor importance at that time.

"If he got the infection from his hand or finger and it hurt in his neck and shoulder, that would be the natural consequence of an infection in the hand; it certainly would; that often happens merely from a hang nail or any other injury.

"I am very positive that the boil on his neck was a secondary cause of his condition; I mean by that that it came from an infection somewhere else; that it did not originate there.

"The infection from his hand, such as he had, would likely and probably produce a boil or something on that side; it certainly can and it is done so repeatedly.

"I feel just as positive as that I am sitting here that the boil was caused from the infection in his hand—that that was the primary cause.

"I think the direct, proximate and primary cause of the blood poison was the cut on his hand; I have every reason to believe that was the origin of it.

"If one sustains a cut on the hand or any part of the body from something like a license plate or a piece of tin or metal, that increases the hazard of septicemia; it is a great deal more hazardous than being cut with a clean instrument; a license plate is naturally exposed to germ infection and filth from the street and leaving a rough jagged cut, it would leave many openings for the infection. In the first place, a license plate cannot be clean, to start with, or free from filth, and we always figure that the dirt from the street is more dangerous than the dirt from the field as a result of the different mixing of contamination; it has manure and various pus germs and everything else in it; in other words, a license plate is an instrument that is ground in the dirt constantly.

"Q. In view of your statement that septicemia may be caused by a furuncle or this boil in that the infection gets into the blood stream, how do you state that you know that this septicemia was caused from the back of his hand and not the boil on his neck? A. I think I can explain that. In the first place, the boil that was on this boy's neck was comparatively of small size and from general symptoms—his enormously high fever

and the chill and perspiration and vomiting and the fainting, it would be almost preposterous to say that this small boil on his neck was doing that much damage. That is what I mean. He was violently sick when I saw him.

"I don't know whether I have seen people die from septicemia just from a boil, unless the boil had been interfered with something like squeezing it or breaking it or something like that, and then I suppose it could do so, but as a general thing, a boil is not necessarily dangerous. I suppose they often result in septicemia; I would not say that they do so quite often because I never saw many such cases.

"With reference to infection from a pimple, I will say that the infection usually spreads from the picking of the pimple and not from the pimple; it is frequently infected by picking it with dirty hands thereby breaking down the wall and letting the infection get into the system.

"I don't recall whether there was any evidence of this boil having been picked or squeezed; I don't recollect that at all; I could not see any special evidence of that.

"The ordinary boil, unless it is picked or squeezed, hardly ever produced septicemia; I am glad that it is very rare that they do. To have a boil, you have infection, but not septicemia; it is strictly local infection.

"When we opened this boil, we did not find any pus because it had gotten away from the pus stage; it was an enormous swelling; we did not find any pus there at that time. The opening on this occasion went clear down to the boy's spinal column and we didn't get any pus at all.

"At that time there was a small amount of pus underneath the scab on his hand. It would not take much pus to get an infection from a wound on the hand; you can get enough pus in that way to kill you, and it has been done thousands of times.

"Certainly boils are frequently by infection; a man may have syphilis and boils will break out on him or diabetes, and more frequently from that than anything else; there is no doubt but that any kind of an infection will cause a boil or break out.

"If the septicemia was induced or brought into the blood stream from the boil, it would not necessarily follow that you would find a lot of pus in there at the time it was lanced."

Dr. Frank Beall, a witness for appellant, gave it as his opinion, in substance, that, while possible, it was not probable that the septicemia originated in the wound on the hand of the deceased. But on cross-examination he testified, among other things, that:

"An infection in some part of the body could have produced the abscess; that is true. An infection may arise from a particular place without leaving any evidence of the infection originating there; that is true. In other words, from the infection in his hand,

the abscess on his neck might have originated there and thereby have produced and resulted in the condition in his head. That is a possibility."

Dr. Hodges McKnight, a witness for appellant, testified on cross-examination as follows:

"As to the possibility of the infection in his hand lodging in some other part of his body, such things do occur. It is absolutely possible that you may receive an infection through a wound on one spot on the body and at some other part of the body remote from the seat of the injury, while the place of the origin of the infection may not show any symptoms of being involved. In other words, a man would receive an infection from a wound on his hand and the infection could lodge in his brain or at some other place, and upon examination, the hand would be found to be practically well.

"It is a fact that people often die from septicemia, but not necessarily from boils. You were talking about boils. A person could die from septicemia produced by picking a pimple on the face. A boil means a certain amount of pus—in other words, infection. A pimple is not really a boil, technically speaking, but infection can set up from a pimple, just the same as from a boil; it is the mashing of the pimple like people ordinarily do that brings on the trouble; that breaks down the wall and throws pus into the system.

"To explain the lymphatic system, I will say that we have blood vessels—arteries and veins, and the next thing is the lymphatics. When you hurt your finger, you first hurt it at the seat of the injury, and in two or three days, your hand begins to swell and then it gets up into the arm and finally it gets to the arm pit and then the pain gets up into the neck and then down in the region of the heart. That is where the infection is carried by the lymphatics; it is quite an extensive system, and each one of these carries its own part of it.

"Dr. Beall was the first doctor to examine this young man when he was brought up here to the hospital. We will say that he got to the hospital at about ten or even as late as eleven o'clock; he was out somewhere and when he saw this patient he had a very high fever; the boy was almost blue and his circulation was badly impaired and he was breathing in the neighborhood of forty times a minute, when twenty is normal and his pulse was way out of line—how high I don't know and he vomited a number of times before Dr. Beall saw him. When Dr. Beall and I first examined him together, we thought there was a possibility of his developing pneumonia, on account of his increased respiration and breathing so fast and so hard; the pneumonia never did develop, but we thought possibly it might.

"From the size of this boil, I did not think it would cause septicemia; it was a small insignificant thing, similar to the ordinary boil; we will use the word pimple to best indicate the size of the boil; it was not very large at all.

"I am of the opinion that this infection came from this boy's hand into the lymphatics, and the lymphatics will carry so much poison without breaking down—what I mean by breaking down, forming an abscess; I think it was simply a breaking down in the skin from general infection, and I think this boil was just a local manifestation of the infection that was already there. That is just my opinion about it.

"As to whether it is possible that the infection that caused the septicemia could have come right from this pimple or boil, I will answer your question in this boy's case and say, no; if you are speaking of some other case, I will say, yes.

"Judging from the location of the boil on the neck, it being on the right side of the neck, and judgment from the history of the case, as I found it and the fact that he was suffering from septicemia, as to what caused the boil, I think it was just more of a general breakdown of those glands in his neck from this violent infection. The septicemia eventually produced the boil. My idea of it is that the original, moving, primary cause of the septicemia and the boil on his neck and all was produced or superinduced by this wound on his hand; no matter whether the boil on his neck aggravated or brought about or produced his death, I think the infection first entered from his hand.

"The infection of the brain in this case would be what you would call a blood infection, it is a blood infection in that it involves a blood vessel.

"This infection of the blood stream gives rise to septicemia because the germs are constantly coming out of that one pocket into the general circulation, and that makes septicemia, of course. In such a case, the infection in the brain would be carried there from some other part of the body.

"When pus gets into the blood in general circulation, it can go anywhere; wherever the blood vessels go, it can go.

"Infection from a wound such as this man had on his hand could easily have gone to the brain or to some other portion of the body.

"If the patient lasts long enough, the infection of the blood stream is liable to produce boils somewhere on the body; that is, if it is not a fulminating sort of infection."

We conclude that the evidence, viewed in the light most favorable to appellee, is amply sufficient to sustain the trial court's finding that the death of insured was the result of septicemia which developed from a cut on his right hand on a license plate while attempting to crank an automobile, and that death so resulting comes within the provision

of the policy under consideration obligating the appellant to pay the $2,000, as found by the trial court. It is perhaps due appellant that we should notice its further proposition that due proof that the death of insured was caused by bodily injuries effected exclusively and wholly by external, violent, and accidental means had not been made. Appellee objects to this proposition as not germane to any assignment of error presented, and we so find the case to be.

■ The only assignment of error in which any reference to this question is made is the fifth, in which it is urged that the court erred in rendering judgment "for penalty and attorneys' fees," for the reason that the undisputed proof showed that plaintiff failed and refused to submit such proof to the defendant as was required. Moreover, we do not feel prepared to hold that the finding which must be imputed to the judgment of the trial court that the proof complied with the requirements of the policy is unsupported. The proof questioned consisted of the certificate of Dr. Nifong, which gave the place of the insured's death as at the Southwestern Hospital on August 24, 1927; that the disease of which he died was septicemia, confirmed by a blood culture; that his last illness was complicated with or induced by a furuncle (boil) on the neck, which in turn was complicated "with local wounds on right finger."

B. A. Wise testified that he at the time was an agent of appellant insurance company, connected with the Fort Worth office; that he went to Mansfield to secure proofs of insured's death and procured the proofs just referred to; that he told appellee, after having investigated the case, that the claim department did not have evidence enough to support a claim for double indemnity, and that he would have to produce "substantial evidence enough to prove that the man died from accidental means," and that the investigation did not so show. He further testified:

"I was familiar with the whole case at that time and I investigated it; I made the investigation that was required of me to make; I found out that several days prior to his death this boy had received a cut and that he had been in the hospital and was operated on. I did not find out that he had died from septicemia or blood poison—I am not familiar with those terms and I would not be able to say as to that. I suppose I know what blood poison is, and the statement of the doctors showed that he died of blood poison, but I didn't know that when I was talking to Mr. Casstevens, the beneficiary under the policy. The reports that I had at that time showed that he died of septicemia, and I knew what those reports showed."

As it seems to us, the knowledge on the part of appellant's agent of the wound, of the name of the physicians attending insured at the hospital, coupled with the report of Dr. Nifong that the proofs insisted upon, was reasonably sufficient.

We conclude that all assignments of error must be overruled, and the judgment affirmed.