**CONSOLIDATED CHEMICAL INDUSTRIES, Inc., v. RAILROAD COMMISSION.**

**No. 9615.**

Court of Civil Appeals of Texas. Austin.
March 12, 1947.

Rehearing Denied April 2, 1947.

Leffingwell, Currie & Davis, of Dallas, for appellant.

Grover Sellers, former Atty. Gen. of Tex., of Sulphur Springs, Price Daniel, present Atty. Gen. of Tex., and James D. Smullen, Charles D. Mathews, and Elton M. Hyder, Jr., Asst. Attys. Gen., for appellee.

Herbert L. Smith and Zollie C. Steakley, both of Austin (Smith Rotsch & Steakley, of Austin, of counsel), for Texas & New Orleans R. Co.

McCLENDON, Chief Justice.

Appeal by Consolidated (Consolidated Chemical Industries, Inc., plaintiff below) from a final judgment denying the re-

lief sought in a suit to set aside an order of the Commission (Railroad Commission of Texas, defendant below), which granted to the Railroad (Texas & New Orleans Railroad Company, intervener below) authority to apply a special sub-normal rate of 8 cents per 100 pounds on sulphuric acid shipped in tank cars of not less than 100,000 pounds direct over the Railroad's line from Chaison (Beaumont), and Port Arthur to Houston. The normal rate was 16 cents per cwt. The basis of the order was to meet "impending" competition from unregulated transportation by water shipment via the intracoastal canal. The controlling questions on the merits of the case are (1) whether there was substantial evidence of the existence of such "impending competition," and if so (2) whether the substantial evidence rule applies to a suit brought under Art. 6453, R.C.S.

We make the following statement regarding the first of these questions:

Southern (Southern Acid and Sulphur Company) has two plants, one at Chaison and one at Port Arthur, in which it manufactures sulphuric acid. It also operates under lease from the Federal Government a plant at Houston (Pasadena), in which it uses large quantities of sulphuric acid in the manufacture of phosphate fertilizers. This lease expires in 1949, but it was in evidence that it carried an option to purchase at expiration, and that plans were under way for its material enlargement in capacity by the Government. Consolidated has a plant at Houston in which it manufactures sulphuric acid. It also has similar plants at Baytown and Corpus Christi, from which points it enjoys special sub-normal rail rates to Houston of 4 and 11 cents per cwt., respectively, predicated on water transportation competition, each of which rates was made at its instance. It does not actually use the Baytown rate, however, for the reason that it does its own barging from that point. Southern is a large customer of Consolidated, purchasing from it for its Houston plant approximately 8,000 tons of acid per month. After an extensive investigation Southern concluded that it might either by contract or in its own barges (to be acquired) have its acids transported

via intracoastal canal from Chaison and Port Arthur to Houston for approximately 6 cents per cwt. Upon this representation, supplemented as to some factors by its own investigation, the Railroad made the application for the 6-cent rate. At the hearing before the Commission, which appears to have been quite thorough, the Railroad, Consolidated, Southern and the League (Texas Industrial Traffic League) were represented. Findings and conclusions of the Commission, filed with and made a part of the order, set forth in much detail the substance of the evidence at the hearing and the conclusions of the Commission thereon. The following are quotations therefrom:

"Southern has no water front facilities at Chaison or Port Arthur but it was stated that docks of the Kansas City Southern Railway at Port Arthur, and the city docks at Beaumont are available for the loading of acids into barges from tank cars direct, the tank cars to be moved from the plants in multiple lots.

"The storage facilities at Chaison and Port Arthur are adequate for the accumulation of barge load lots but additional storage capacity must be provided at Pasadena regardless of the method of transportation used.

"Representative of Southern testified that the total cost of handling and transporting acid by barge from Chaison and Port Arthur to the Pasadena plant would be 5.6703 cents per 100 pounds."

Then ensues a breakdown of these cost figures:

"All of these cost figures are challenged by Consolidated, which will be discussed later.

" 'Counsel for the League stated that it is interested only in the principles involved in this case, and others of its kind in which rates may be sought that would unduly prefer some shippers and unduly prejudice others.

"Its position, as stated on brief, is that before prescribing special rates less than reasonable basis previously prescribed we should find on clear and convincing evidence that:

"1—There is actual or impending competition from some other carrier or transportation agency.

"2—Such competition will deprive applicant of the opportunity to handle the traffic under the reasonable maximum rates previously prescribed.

"3—The rates sought will yield more than the actual out-of-pocket expense.

"4—The rate will not adversely affect competitors or the shipping public generally because it is already available by some other transportation agency.

"As relating to special rates proposed by carriers for the purpose of meeting some form of competition we agree with the position taken by the League, as above stated.

"The record indicates that at this time no carrier operating on the Intracoastal Waterway is prepared to furnish barges for the transportation of sulphuric acid. This may be for the reason that there has been no demand heretofore for such service. However, the evidence presented appears clear that ordinary barges which may be suitable for the transportation of oil or other liquid commodities are not suitable for the transportation of sulphuric acid."

Evidence of conflicting witnesses upon the various cost elements involved in barge transportation between the points in issue is then set forth with much particularity. The Commission proceeds:

"There is such a diversity of opinion among parties concerning the practicability of barging the involved traffic in the manner described, and such conflicting evidence as to the cost thereof that it is most difficult indeed to arrive at a definite conclusion in the matter.

"The record shows that, upon carriers' application, we have prescribed a number of special rates on sulphuric acid between points along the Intracoastal Waterways for the purpose of meeting barge competition.

"Not in all instances before us were barge costs shown in detail, but testimony was offered to the effect that the rates applied for were necessary in order for applicants to secure the traffic, otherwise it would be moved by barge, and in all cases it was stated that the rates would produce a profit above expenses.

"Our Docket No. 4832-R involved an application presented on behalf of the Missouri Pacific Lines and the T&NO Railroad for authority to establish reduced rate of 11 cents per 100 pounds on sulphuric acid from Corpus Christi to Baytown, Houston and Texas City, and rate of 10 cents per 100 pounds from Corpus Christi to Dow (Velasco).

"At the hearing, which was held August 27, 1942, representative of Consolidated offered testimony in support of the application, and stated:

" 'One year ago we found that we could barge acid to Houston, Baytown and Texas City at a cost of $1.06 per net ton, and to Dow at 86 cents per net ton, and that was based on amortizing the cost of the equipment over the life of the contract, which is 5 years. * * * Now when this application went to the rail lines we made further study in order to bring our figures down to date and while these figures are quite conservative to both sides, they certainly do represent the maximum cost that we would have in moving the acid, and that is $1.51 per ton to Houston, Baytown and Texas City, and $1.18 to Dow; this is from Corpus Christi.'

"Reduced to cents per 100 pounds the barge cost from Corpus Christi to Houston would be 7.55 cents.

"While these cost figures were not broken down into separate units of expense it may be assumed that they include such items as towing, pumping at origin and at destination, maintenance and insurance, and perhaps amortization.

"The distance via the Intracoastal Waterways to Houston from Corpus Christi is 262 miles, from Beaumont 148 miles and from Port Arthur 121 miles, so it would appear that unless these elements of cost have increased materially since 1942, the cost of moving acid in privately owned barges from Beaumont and Port Arthur to Houston should be somewhat less than from Corpus Christi.

"The cost of barge transportation from Beaumont and Port Arthur to Houston shown by Consolidated appear to be predicated on Southern acquiring and operating its own barges and providing additional facilities therefor.

"Witness for Southern stated that a survey was being made to determine the advisability of such operation, not only as to the traffic here involved, but also in connection with other and extensive movement of its supplies and products by water. At this time, however, they do not appear to have any intention of engaging in their own barge operation.

"As heretofore stated the opinion of parties differ materially with reference to the movement of acid by barge from Chaison and Pt. Arthur to Houston.

"Witnesses for Southern, who from experience appear to be well qualified, state that acid can be handled by barge in the manner described. Witnesses for Consolidated, who appear to be just as well qualified, are of opinion that it cannot be so handled with safety, at least they would not attempt to handle acid in such manner.

"There may be some hazard attached to the transfer of sulphuric acid from tank cars to barges, but upon this record we are unable to determine that it cannot be done.

"The fact that at the present time no carrier operating on the Intracoastal Waterways between Beaumont-Port Arthur and Houston is in position to barge sulphuric acid between those points is not sufficient grounds for us to conclude that some other carrier is not in position to afford the service, nor to conclude that the quotation obtained by Southern of 75 cents per ton is not bona-fide. Neither can we conclude that the acid cannot be handled in the manner shown by Southern.

"As shown above some of the elements of cost shown by Southern for the transportation of acid by barge between the involved points appear to be erroneous, and when those costs are readjusted to reflect the proper charges, the actual cost of transporting acid by barge from Chaison and Port Arthur to Houston would be slightly in excess of 7-½ cents per 100 pounds.

"For these reasons, and from the evidence presented, we do not believe that it will require a rate lower than 8 cents per 100 pounds in order for applicant to secure the traffic in competition with the impending barge service."

There follows a resume of the evidence on cost of the involved rail handling, not here in issue. The Commission concludes: "We are of opinion and find that the application herein to establish rate of 6 cents per 100 pounds to apply on sulphuric acid in tank cars between Port Arthur and Chaison, on the one hand, and Houston, on the other hand, has not been justified, but we are of opinion and find that a rate of 8 cents per 100 pounds to apply on the commodity and between the points involved will be just, reasonable and proper, and should be established."

From a careful perusal of the 426-page transcript of the evidence at the trial below, we have reached the conclusion that it will support a finding that the order was supported by substantial evidence. The considerations upon which we base this conclusion follow:

It seems to be the position of Consolidated that the Commission itself did not find the existence of "impending" water competition. We do not so construe the above-quoted findings. On the contrary, we think it clear that the Commission construed the evidence as warranting factual findings in support of its order, based upon the criterion which it recognized in its findings as governing its action. The record shows, without controversy, that there was no water carrier equipped to transport the acid in bulk between the points in question, and no present demand for such traffic other than that of Southern. Due to the specific gravity of sulphuric acid (almost twice that of water, and almost three times that of commercial crude oil) it requires specially constructed tanks, and an incidental large capital outlay for its water transportation. In order for Southern to have obtained such transportation it would have been necessary to make a contract therefor with some carrier, covering a period of time sufficient to yield a profit from the investment beyond

the current cost of operation; or to obtain and operate its own facilities. It was further shown that after such contract was made or such facilities acquired by Southern, all opportunity of the Railroad to obtain such traffic would be lost. The traffic manager of Southern testified that Southern represented to the Railroad that it was ready, able and willing to effect the necessary arrangements for water transportation unless a competitive rail rate could be obtained; and that such representation was true, based upon the investigation Southern had made. Although highly conflicting, the evidence was ample to support the Commission's finding (in effect) that a water rate of "slightly in excess of 7-½ cents per 100 pounds" was feasible. In reaching this conclusion the Commission was warranted in taking into consideration other similar water rates, especially that from Corpus Christi to Houston, which was made at the instance and upon representations of Consolidated. That rate of 11 cents was reasonably comparable to the 8-cent rate in issue, based upon the additional length of haul and other elements of additional cost and hazard in evidence. In a matter of the intricacy and size of investment of that in issue, determination of such feasibility must necessarily depend largely upon the opinion evidence of those experienced in the particular field. It would hardly be practical to obtain bona fide bids or detailed accurate estimates from reliable concerns engaged in the business, merely for the purpose of obtaining information upon which to predicate a competitive rail rate.

■ "Impendency", as applied to the prospective happening of an event, connotes the present existence of a threat; and excludes the element of certainty. In determining such existence, vel non, the proximity and remoteness of the threat are essential elements for consideration. There must be reasonable probability, as distinguished from mere possibility, of such happening. Necessarily, therefore, determination of existence of impendency of happening of a particular event, is dependent upon the particular situation and subject matter involved. Contingencies which might appropriately be regarded remote in one situation, might very reasonably be regarded as proximate in another. To the extent and within the bounds that different reasonable conclusions may be drawn from a given situation, discretion to resolve such differences reposes in the authority to which is delegated the power and duty of such resolution. Here, to the Commission is delegated such power and duty, and its conclusions as applied to the particular situation are (under the substantial evidence rule) subject to judicial review only to determine whether they have reasonable basis in the facts and circumstances involved in and surrounding such situation. Our conclusion is, as stated above, that the order is supported by substantial evidence.

■ Upon the second issue: If the substantial evidence rule applies, the judgment must be affirmed under our above holding. If Art. 6453 requires an independent judicial factual review, the cause must be remanded, since a jury trial was denied Consolidated. It is the latter's contention that: "The substantial evidence rule has never been held to apply in a case of this kind."

No subject in the field of administrative law in this State has been more fruitful of controversy than that of the character of judicial review required under our statutes.

The holding in the Marrs case (Marrs v. Railroad Commission, 142 Tex. 293, 177 S.W.2d 941) that where confiscation is involved (which is not the case here) independent factual judicial review is essential to meet the constitutional requirement of due process, was in effect overruled in the recent case of Trapp v. Shell Oil Co., Tex. Sup., 198 S.W.2d 424. The only other questions that could arise regarding this subject relate to the proper construction of reviewing statutes. The wording of Art. 6453 relating to the character of review it requires is that such action "shall be tried and determined as other civil causes in said court." This is the identical wording employed in Art. 911a, Sec. 17, V.A.C.S., which has always been construed as importing the substantial evidence rule. Railroad Commission v. Shupee, Tex.Civ.App., 57 S.W.2d 295, affirmed 123 Tex. 521, 73 S.W.2d 505. Only recently that holding was reaffirmed in Railroad Commission v. Metro Bus Lines, 144 Tex. 420, 191 S.W.2d 10, 11. The Trapp case, above, applied the same

construction to Art. 6049c, Sec. 8. The Trapp opinion makes the following reference to the Shupee and Lone Star cases [19 S.W.2d 436]: "While we are here concerned with only cases arising under Article 6049c, Section 8, it is not inappropriate to point out that our predecessors, in the case of Railroad Commission v. Shupee, 123 Tex. 521, 73 S.W.2d 505, 509, gave a similar and perhaps a more compelling statute the same construction which this court gave to Section 8 of article 6049c in the Gulf-Atlantic case. Nor are we concerned here with a different rule stated in Lone Star Gas Co. v. State, 137 Tex. 279, 153 S.W.2d 681, 692, where the case was turned upon the legislative mandate that such a case 'shall be tried and determined as other civil causes in said court'. It is sufficient to point out that no such comparable language was employed in the statute concerning the appeal of the present case."

Consolidated points out the following differences in the wording prescribing the respective duties of the Commission in the classes of cases involved in the Shupee and Trapp cases and in that at bar, as calling for a different decision in the latter. Art. 911a, § 3 (Shupee case), makes it the duty of the Commission to grant the certificate "if in the opinion of said Commission the issuance of such certificate will promote the public welfare." Art. 6049c, § 7 (Trapp case), requires action "if upon the hearing the Commission shall find that waste is taking place, or is reasonably imminent." Whereas Art. 6448 (instant case) requires the Commission to "fairly and justly classify and subdivide all freight" and to "fix to each class * * * a reasonable rate." (Sub. 2.) The point is made that if the statute had provided that the rate should be such as the Commission "shall find to be reasonable," the substantial evidence rule would apply; the implication being that since it does not so provide no discretion is lodged in the Commission. Sub. 2 expressly provides that the classification shall be such "as may be found necessary and expedient." Sub. 3 also carries a similar expression, "if found necessary to do justice." Likewise Sub. 6 requires the Commission to: "From time to time, alter, change, amend or abolish any classification or rate

established by it when deemed necessary." (Emphasis added in each quotation.) By whom "found necessary and expedient"; by whom "found necessary to do justice"; and by whom "deemed necessary?" The answer is self-evident, and implies findings and conclusions by the Commission as the bases of its orders; and, as a necessary corollary, the discretionary power to weigh the evidence bearing upon the situation. The character of judicial review prescribed in the statute here involved and that in the Shupee case being identical, they call for identical constructions.

We pretermit any discussion of the Lone Star case further than to advert again to the construction given that decision in the Trapp case that "the case was turned upon the legislative mandate that such a case 'shall be tried and determined as other civil causes in said court'." The identical legislative mandate is contained in the statute construed in the Shupee and Metro Bus cases; the holdings in which we feel constrained to follow in this case.

The trial court's judgment is affirmed.

Affirmed.