**ABILENE & SO. RY. CO. et al. v.
TERRELL et al.**

No. 8864.

Court of Civil Appeals of Texas.   Austin.
June 21, 1939.

Rehearing Denied July 22, 1939.

Claude Pollard, of Austin, Andrews, Kelley, Kurth & Campbell and Baker, Botts, Andrews & Wharton, all of Houston, Thompson & Barwise, of Ft. Worth, Terry, Cavin & Mills, of Galveston, Robert Thompson and Adair Dyer, both of Dallas, J. D. Dodson, of San Antonio, W. M. Streetman, of Houston, Fred L. Wallace, of Ft. Worth, Tom Martin Davis, of Houston, and Ballinger Mills, of Galveston, for appellant.

Gerald C. Mann, Atty. Gen., and George W. Barcus, Asst. Atty. Gen., for appellees Railroad Commission.

Weaver H. Baker, of Junction, and Luther W. Davis, of Austin, for intervener-appellees Texas Sheep & Goat Raisers Ass'n, Inc., and Texas & Southwestern Cattle Raisers Ass'n, Inc.

McCLENDON, Chief Justice.

This proceeding is a direct attack upon an order of the Railroad Commission which extended from January 1, 1938, to March 1, 1938, emergency drought freight rates "on shipments of livestock feed stuffs moving intrastate in Texas to destination points in some thirty Texas counties named in the order," promulgated under authority of R.C.S., Arts. 6458 and 6459. The plaintiffs are several Texas rail carriers; the defendants are the Railroad Commission, its members, and (by intervention) the Texas Sheep & Goat Raisers' Association, Inc., and the Texas & Southwestern Cattle Raisers' Association, Inc. The relief sought is annulment of the order and ancillary injunctive relief. The appeal is by the plaintiffs from a final judgment denying them any of the sought relief.

The grounds of attack upon the order, urged in thirteen propositions in appellants' brief, are substantially summarized in the three following contentions:

1. No emergency existed within the meaning of the statutes, because the drought conditions during the time covered by the order had been continuous, with slight intermission, for a period extending back nearly four years immediately preceding the order.

2. The order was unjust, unreasonable, and discriminatory, in that it created unjust and unreasonable preferences, discriminations and rebates among consumers, rail carriers and localities with respect to the same commodities and services, contrary to the constitution and statutes of the state.

3. The rates established by the order were violative of the State and Federal Constitutions, "in that they and their enforcement deprived and will deprive appellants of their property without due process of law, and deprive them of the equal protection of the laws."

The following quotation from appellants' brief gives in brief outline the historical background of the order:

"On June 4, 1934, L. E. Kipp, who was a publishing agent of certain Western Trunk Line Railroads in Chicago, issued an interstate tariff putting in certain emergency drought rates to certain Western territory, effective June 4, 1934, and sent a

copy of such tariff to the Railroad Commission of Texas, and in substance requested the Texas Commission to authorize the same reduced rates on Texas intrastate traffic. These rates were a 50 per cent reduction of the standard rate on hay and a one-third reduction on grain and grain products and cotton seed cake and meal.

"The Texas Commission, effective June 4, 1934, entered an order making such rates effective on shipments moving to destination points in six Texas counties, but other counties were added in rapid succession by other orders not covered by any application from Kipp, or any one else, until finally by August 31, 1934, shipments to destination points covering all of 242 counties in Texas were under the orders of the Commission for the reduced rates. The original order of the Commission provided that the reduced rates should expire on September 4, 1934, but they were restored by an order entered and effective from September 17, 1934, this order being not made on application of the carriers, but on the Commission's own initiative. There was no immediate opposition to the extension of these rates voiced by the carriers, for the reason that on further request of the Agricultural Adjustment Administration in Washington the rates were extended from time to time on interstate traffic moving to certain counties in Texas so that grain or feed stuffs could move from Oklahoma or Kansas, or anywhere in the middle west into the Texas counties named on reduced rates, and so long as this interstate condition existed in 1935 and 1936, the Texas lines did not voice any opposition to the intrastate rates. Some of the rates were permitted to expire on July 3, 1935; others were continued to June 30, 1936, and some were continued right on through to June, 1937. There was a complete cancellation of all of the interstate emergency drought rates on March 30, 1937, but before that date a great many counties had been dropped from the tariffs establishing the low interstate rates, and a few counties had been dropped from the intrastate rates by order of the Texas Railroad Commission. With the exception of a short interval in 1936, the rates were in effect from June, 1934, to June, 1937, as to some of the counties specified in the various orders. The low rates were not effective after June 30, 1937, until August 30, 1937, the regular tariff rates being the lawful rates during that period. By order of August 30, 1937, the Texas Commission put into effect the same reductions of 50 per cent and 33⅓ per cent, effective August 30, 1937. In the meantime, and prior to June 30, 1937, the Texas railroads had made certain protests against the continuation of the drought rates. A suit was filed in the court below on September 30, 1937, to enjoin the order of the Commission of August 30, 1937, putting into effect the reduced rates, which, according to the order putting them into effect, would have expired November 30, 1937. A temporary restraining order was entered in the suit so filed, and later during October, 1937, a hearing was had on an application for temporary injunction. After the evidence at such hearing was introduced, certain representatives of the railroads and of the defendants and intervenors had a conference as a result of which, and solely in the nature of a compromise of the then pending litigation, an application was filed by the carrier plaintiffs with the Railroad Commission for reduced rates on the feed stuffs mentioned to certain designated counties, the same to be put into effect as of October 1, 1937, and to expire November 30, 1937, and in accordance with such application the Railroad Commission on October 20, 1937, issued its Freight Circular No. 12079 putting in a 25 per cent reduction in the rates, in accordance with the application of the carriers, to certain named counties.

"All of the orders of the Commission above referred to were made without notice to the carriers, or hearing, except where otherwise stated above. On November 23, 1937, about a week prior to the expiration of the order of the Commission contained in Railroad Commission Circular No. 12079, above referred to, the Texas Commission entered an order, its Railroad Freight Circular No. 12104, continuing the 25 per cent reduced rates to December 31, 1937, which order was entered without notice or hearing to the carriers, and set for December 6, 1937, a hearing to determine whether the reduced rates should be extended in effect after December 31, 1937. Pursuant to such notice and hearing, the Commission on December 7, 1937, issued its Railroad Freight Circular No. 12116, by which it extended the reduced rates (25 per cent reduction below standard tariff rates) effective from January 1, 1938, to March 1, 1938, as to thirty counties named in the order, six of which counties were in the Northern part of the Texas Panhandle, and the remainder in South Texas. * * * This suit was filed to enjoin the order of

the Commission embraced in its Railroad Freight Circular No. 12116, dated December 7, 1937, continuing the reduced rates in effect from January 1, 1938, to March 1, 1938."

As to the drought conditions prompting the order it was agreed:

"* * * that a severe drouth condition existed from September 1, 1937, to December 7, 1937, in all of the counties included in Railroad Freight Circular No. 12116, * * * and that thereafter some rainfall was had in certain of said counties, but that by reason of the late season of the year no sufficient range forage is available for the sustenance and maintenance of domestic livestock, that would in any manner alleviate the drouth condition existing, and that such range forage will remain deficient in quantity until at least the first of March, 1938.

"* * * that more than a million head of sheep and goats and many thousands of head of cattle are ranged in the counties affected by the aforesaid order No. 12116, and that much supplemental feeding has been necessary during said period of time over and above the normal supplemental feeding, in order to keep said stock in proper living condition.

"* * * that the forage crops usually consumed in said counties by the livestock industry was materially depleted by said severe drouth conditions, and that no sufficient amount of the commodities described in the above order was and is available locally for the consumption of domestic livestock raisers."

That unusual drought conditions affecting a large area do constitute such an emergency as to authorize temporary reduction in freight rates has long been recognized by the Interstate Commerce Commission and by rail carriers alike. As early as 1895, the Federal Commission granted an application of certain carriers to establish such emergency rates effective in certain parts of Nebraska (Application of Fremont, Elkhorn & M. V. R. Co. et al., 6 I.C.C. 293); the order reciting:

"That in the crop year of 1894 there was at Humphrey and Norfolk, and points west thereof in Nebraska, along the line of said Fremont, Elkhorn & Missouri Valley Railroad, such a failure of crops that the people of that locality were in a measure destitute, and without the necessary food for themselves and their domestic animals.

"In view of the above-ascertained facts the petitioners should be authorized to charge · less for the longer distance to Humphrey or Norfolk, and places above-described west thereof, than they may charge for shorter distances, to the extent and in the manner provided for in their said tariff taking effect February 11th, 1895, and it will be so ordered."

A number of subsequent instances might be cited in addition to those enumerated above in appellants' history of the order. It is to be noted that the order .had its inception in an emergency interstate tariff issued by "certain Western Trunk Line Railroads in Chicago." We see no merit in the contention that the emergency conditions had determined due to the protracted duration of the drought. Such protraction would only serve to increase the distress and accentuate the necessity for emergency relief. It is not, nor could it be, contended that these conditions had reached a stage of practical permanency. In the circumstances, the issue as to the determination of the emergency conditions was a matter resting in the sound discretion of the Commission, unreviewable by the courts where, as here, there was substantial factual basis for the Commission's finding. Avent v. United States, 266 U.S. 127, 45 S. Ct. 34, 69 L.Ed. 202.

Appellants cite a number of cases wherein "emergency" as used in various statutes is defined and applied. They also cite a number of lexic definitions of the term. These decisions and definitions are not controlling here. Lack of the elements of suddenness and unforeseeableness is not determinative. Drought in its very essence is not sudden in the ordinary meaning of that term. However (in the present state of scientific knowledge), it is unforeseeable both as to time and duration. Foresight might to a very limited degree make provision to avert some of its deleterious consequences; but adequately effective precaution is not practical where large areas, devoted to particular basic industries or branches of agriculture, are affected. A wise precaution should no doubt make reasonable provision for emergency; but this is humanly practical only to a very limited degree; and that which is not humanly practical is not humanly possible where a substantial portion of the population is affected.

Appellants' second contention above— that the rates create unjust preferences,

discriminations and rebates among consumers, rail carriers and localities—is predicated upon the following asserted considerations:

As to consumers, specifically:

1. The reduced rates are made available only to consumers, graziers or feeders of livestock who use the commodities only for feeding livestock owned or controlled by them in the specified counties, and not made available to any other consumers of the same commodities although located in and using the commodities in the same counties.

2. "Also because the order applies only to a designated class of consumers using the commodities for feeding livestock owned or controlled by them in the designated counties and similar and other consumers using the same commodities are not entitled to and do not receive the benefit of the reduced rates, although a like and contemporaneous transportation service is performed in connection with the commodities. It is also charged that in many instances the rate paid by a consumer using the commodities for feeding livestock owned or controlled by him in a county other than that designated in the order is greater for the rail transportation service rendered from the same origin on the same railroad or railroads and for a less distance than is the ultimate rate paid by a consumer of the same commodities for a like and contemporaneous rail transportation service over the same railroad from the same origin for a greater distance over the same route so that an undue, unjust and unreasonable preference is created in favor of those counties specified in the order and an undue, unjust and unreasonable discrimination against those counties not named in the order."

As regards rail carriers it is manifest that the same inequalities would exist, since the reduced rates were applicable only in the affected territory and to the particular class of consumers above enumerated. Illustrations of this inequality might be multiplied indefinitely.

The same is also manifestly true with reference to localities.

■ The general rule applicable to the instant inquiry, supported by authority in this and other jurisdictions, is thus expressed in 8 Tex.Jur. pp. 1139-40: "Neither the English statutes, nor the Interstate Commerce Act, nor the Railroad Commission Act forbids all discrimination. It is not mere discrimination that is rendered obnoxious and unlawful by the Texas statutes; it is unjust discrimination that is denounced. Prior to the enactment of the Railroad Commission Law, railroads were authorized by statute to make their own rates but were limited in their charges to reasonable sums, the charges to be uniform on each class of freight; and unjust discrimination was forbidden. The fact that the carrier charged one person a greater sum than was charged to another for transportation of goods of the same kind and class in equal or greater quantities for the same or less distance was made prima facie evidence of unjust discrimination; but the carrier was permitted to rebut this presumption by showing that it was not unjust discrimination. It will be observed that the violation of the law did not consist alone in the discrimination in charges, but depended upon the justness of such discrimination. The statute declared in negative form what the common law affirmed on the subject; that is, at common law a carrier was permitted to discriminate, provided the circumstances were not such as to make discrimination unreasonable and unjust."

Articles 6458 and 6459 read:

"6458. The Commission may prevent interstate rate wars and injury to the business or interests of the people or railroads of the State, or in case of any other emergency, to be judged of by the Commission, it shall temporarily alter, amend or suspend any existing freight rates, tariffs, schedules, orders and circulars on any railroad or part of railroad in this State, and fix freight rates where none exist. Said rates so made, shall take effect at such time and remain in force for such length of time as the Commission may prescribe."

"6459. The Commission shall have power to make temporary freight and passenger tariffs, to take effect at such times as said Commission shall fix whenever an emergency arises, the sufficiency of which shall be judged of by said Commission. In order that justice may be done or injury prevented any person, place or locality, said Commission shall have the power at once to suspend temporarily any existing freight or passenger tariffs, rules and regulations for temporary use, to have immediate effect where none exists."

■ The mere fact of the existence of an emergency calling into action the powers of the Commission under these articles

necessarily presupposes that in meeting the emergency discriminations, preferences and inequalities will be created. The objections urged by appellants would be valid only where such discriminations, preferences and inequalities were unjust or unreasonable; and such injustice or unreasonableness could only arise in case of emergency where the power was exercised in an unreasonable or arbitrary manner. We find nothing in the order or its operation to warrant a legal conclusion of unreasonableness or arbitrariness. It applied only in the territory in which the emergency conditions existed, and only to those engaged in the principal industry affected by the conditions creating the emergency.

Appellants cite, as sustaining their contention, Stuart v. Norfolk & Western Ry. Co., 191 I.C.C. 13, 15. That was a reparations case before the I.C.C., and the point involved was whether a tariff regulation was reasonable which limited an emergency rate to "needy" farmer consumers within the drought stricken territory. It was held that this limitation created an unjust discrimination against those not in "needy" circumstances but otherwise similarly circumstanced. The emergency rate, however, was upheld; and reparations were awarded. The decision is not applicable here for the reasons already stated.

■ Finally as to the confiscatory character of the order, we hold that the presumptive validity of the order was not overcome for two reasons.

■ In the first place, we think clearly the well established principle announced in the following quotation from 10 C.J. p. 418, is applicable here: "The public is entitled to demand that no more shall be extracted from it than the services rendered are reasonably worth, and this right takes precedence even over the right of the carrier to a fair return on its investment when the two rights can not stand together. In consequence, the value of the service to the public is an important factor in determining the reasonableness of the rates charged therefor."

Even did the record show, which we think it does not, that the cost of hauling that portion of the commodity affected by the rate reduction was greater than the revenues derived therefrom under the order, the interest of the public in maintaining the industry in the affected territory outweighs this consideration. The prosperity of the sections serviced by the carriers is of mutual concern both to the carrier and the public alike. Consequently, rates designed to alleviate disastrous conditions due to drought or other like calamity, and thereby to promote the continuity of such prosperity, cannot properly be defeated, merely because if taken alone and without reference to ultimate objectives, they might properly be classed as confiscatory.

■ Moreover (secondly), the case here is not brought within the rule for which appellants contend, announced in Gulf, C. & S. F. Ry. Co. v. Railroad Commission, 102 Tex. 338, 113 S.W. 741, 116 S.W. 795 and stated substantially as follows: "If hauling one of the principal articles of transportation over a road does not yield revenue sufficient to pay for the cost of transporting it, not including interest or investment, taxes, or other expenses, then the rate applied to that article is unreasonable and unjust to the railroad." (Quotation from intervener-defendants' brief).

If it were conceded, arguendo, that livestock feed stuffs constituted "one of the principal articles of transportation" over the line of the appellants, still the rate applied only to a portion of the article transported and to that portion only for a limited period. We are not considering at this point the question of discrimination, already determined above. From the viewpoint of confiscation, if that be a valid consideration in emergency rate-making, the issue may not be properly limited to the particular commodity affected by the rate or to the limited time in which the rate is made effective.

It is not amiss to note in this connection that the rate as originally put into effect by the carriers themselves was 50% below regular tariffs, whereas the rate in issue was only 25% below such tariffs—a rate for which the affected carriers had applied covering the period October 1–November 30, 1937.

■ It might properly be added that aside from the foregoing the factors and considerations involved in emergency rate-making are so varied and complex that the ordinary tests of confiscation could hardly be properly applied in determining their validity.

Appellees, intervener-defendants, urge that the case presented here has become moot because the period during which the order made the rates effective has expired, and the subject-matter of the litigation has

therefore become non-existent. In this connection, they point out that appellants themselves voluntarily dismissed an appeal from an interlocutory order of the trial court denying to them a temporary injunction restraining enforcement of the rates pending a trial upon the merits. The issues involved in that appeal had clearly become moot, since the only relief sought was a temporary injunction which could not be made operative as to a period of time already expired. The merits of the suit concerned the validity of the order and the primary relief sought was its cancellation. The sought injunctive relief was merely ancillary. There are two grounds upon which we hold the case not 'moot:

1. If the order were invalid for any of the asserted reasons the carriers would have the right to litigate their claims for recoupment, which issue could not be determined in this case. Nor could such claims be asserted in independent suits, unless the order were set aside in this or some other direct proceeding. To hold the case moot would be a denial of the right to litigate in the courts the validity of a temporary rate.

2. "The questions presented in this appeal are public in their nature, and the public and the railroads and the Commission itself have a vital interest in securing their determination."

These latter considerations have many times impelled the Federal Supreme Court to decide cases otherwise moot. Especially has this been done in reviewing orders of the Interstate Commerce Commission. The following quotation from Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 283, 55 L.Ed. 310, is illustrative: "In the case at bar the order of the Commission may to some extent (the exact extent it is unnecessary to define) be the basis of further proceedings. But there is a broader consideration. The questions involved in the orders of the Interstate Commerce Commission are usually continuing (as are manifestly those in the case at bar), and these considerations ought not to be, as they might be, defeated, by short-term orders, capable of repetition, yet evading review, and at one time the government, and at another time the carriers, have their rights determined by the Commission without a chance of redress."

The trial court's judgment is affirmed.

Affirmed.