TEXAS & NEW ORLEANS RAILROAD COMPANY ET AL V. THE RAILROAD COMMISSION OF TEXAS ET AL.

No. A-4463. Decided November 16, 1955.
Rehearing overruled February 15, 1956.
(286 S.W. 2d Series 112)

324

*Baker, Boots, Andrews* and *Shepperd, Edwin N. Bell, Hutcheson, Taliaferro* and *Hutcheson, Thomas O. Aenold,* all of Houston, *Wigley, McLeod, Mills* and *Shirley, Ballinger Mills, Jr.,* of Galveston, *G. H. Penland, Mart W. Reeves, J. Y. Suggs, William R. McDowell, Bert Thpmdon,* and *Frank C. Brooks,* all of Dallas, *Seth W. Barwise, T. D. Magoffin Thompson, Walker, Smith* and *Shannon, Allen, Gambill* and *Gambill, Stroud* and *Dyer* and *Adair Dyer,* all of Fort Worth, *McKay & Avery, Charles N. Avery, Jr., John J. McKay, Hollers, O'Quinn & Crenshaw,* and *Everett Hutchinson,* all of Austin, *Lowe P. Siddons,* of Colorado Springs, Colo., *Louis A. Schwartz,* of New Orleans, La., for appellants.

The Railroad Commission of Texas has no jurisdiction or power to enter orders determining issues growing out of interstate rates, and the trial court erred in holding that such power is vested in the Commission, and in its conclusion that as a matter of law the orders in suit are reasonably supported by substantial evidence. Railroad Commission of Texas v. Texas Steel Co., Texas Civ. App., 43 S.W. 2d 137, Certiorari denied, 286 U.S. 562, 52 Sup. Ct. 644, 76 L. Ed. 1295; Gulf, W.T.&P. Ry. Co. v. Barry, 45 S.W. 814; Thomas v. Stanolind O. & G. Co., 145 Texas 270, 198 S.W. 2d 420; Hawkins v. Texas Co., 146 Texas 511, 209 S.W. 2d 338.

*John Ben Shepperd*, Attorney General *,Phillip Robinson* and *Mert Starnes*, Assistants Atty. Gen., for Railroad Commission, *Smith & Steakley* and *Zollie C. Steakley*, all of Austin, for Corn Products Refining Co., *Minter & Fender* and *Joe G. Fender*, of Houston, for Imperial Sugar Co., appellees.

In reply to appellants propositions have cited Gulf, C. & S. F. Ry. Co. v. Railroad Commission, 102 Texas 338, 113 S.W. 741; Louisville & Nashville R.R. Co. v. Eubank, 184 U.S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416; United States v. Chicago, M., St. P. & P. Ry Co., 294 U.S. 499, 55 Sup. Ct. 462, 79 L. Ed. 1023.

MR. JUSTICE WILSON delivered the opinion of the Court on rehearing.

On rehearing our original opinion (July 27, 1955) is withdrawn and the following substituted:

This suit was filed under Art. 6453, V.A.C.S., by a number of railroads as plaintiffs against the Texas Railroad Commission as defendant attacking a reduction by that body of certain intrastate freight rates on sugar. Several out-of-state sugar companies also attack it as being discriminatory as between shippers. Plaintiffs alleged that the Imperial Sugar Company had theretofore filed before the Railroad Commission a complaint against the railroads seeking a reduction of rates on intrastate shipments of sugar on the grounds that the existing rates were too high (not justified by transportation costs) and were discriminatory in favor of out-of-state shippers. After a hearing on this complaint, the Commission entered the order attacked at bar amending existing tariffs and reducing the intrastate freight rates on sugar. This suit resulted.

The trial court, sitting without jury, upheld the order. The carriers and out-of-state sugar refineries are our appellants. Sugar refineries located in Louisiana, California, and Colorado have intervened alleging that Texas refineries already have an undue competitive advantage and that a further reduction of intrastate rates will increase this and be both discriminatory and a burden on interstate commerce. There is but one cane refinery (Imperial) and one corn products refinery located within Texas both of which are appellees.

The discriminatory complaint is based upon the fact that competitively sugar seems to sell at any one place at the same price with the cost of transportation included. This is called

destination pricing. This price is arrived at by taking the base price at the nearest adequate base of supply and adding to it a freight prepay. We are not told how the base price is determined. The prepay is a computation of freight costs from the refinery to the place of delivery, plus an allowance for tax and certain other factors.

As an illustration, the price of sugar in Dallas seems to be determined by the base price at Sugarland, which is the site of the nearest sugar refinery, plus a fixed prepay from Sugarland to Dallas. If beet sugar refineries located in Colorado would sell in Dallas, they must do so at this price and themselves pay the additional freight costs from Colorado to Dallas. Because of shipping the greater distance at an interstate rate, the freight charges from Colorado to Dallas will be more than the prepay from Sugarland to Dallas. This difference is known in the sugar trade as the freight rate absorption. In every-day language, this means that the sugar beet companies must themselves absorb as a part of the costs of doing business the extra charge for the freight caused by shipping the greater distance from Colorado to Texas at the interstate freight rate. On the other hand, Imperial's plant located at Sugarland does not have to absorb any transportation cost in shipping to Texas points except to El Paso and Beaumont. In shipping to El Paso, Imperial must absorb the amount by which its freight costs exceed the freight costs from Crockett, California, to El Paso. In shipping to Beaumont, Imperial must absorb the amount by which its freight costs exceed that from New Orleans, Louisiana, to Beaumont.

It is contended that the policy of the Interstate Commerce Commission is to stabilize competitive relationships, and for sugar the Interstate Commerce Commission has adopted the relationship existing on June 30, 1946.

The carriers contend that the Railroad Commission must derive all of its powers from the applicable Texas statutes (Arts. 6445, 6448, 6457, 6460, 6473, and 6474, V.A.C.S., and that a consideration of an alleged discrimination in favor of interstate rates and interestate shippers and against intrastate rates and shippers is not authorized by the Texas statutes.

It is urged that if Imperial prevails here, the out-of-state refineries could insist upon further reduction of the interstate rates by the transcontinental lines to restore the June 30, 1946, competitive relationship, which the Interstate Commerce Com-

mission wishes to maintain. Both California and the Hawaiian Sugar Refining Corporation, Ltd., and Godchaux Sugars, Inc., have already made such an application. If this be granted, Imperial might then go back to the Texas Railroal Commission for another reduction in intrastate rates, and the railroads fear there will be no end to the process. Of course, one limitation upon any reduction of intrastate rates is the question of whether or not the rate be compensatory to the railroad.

There is no question but that the proceeding culminating in the order under attack at bar was initiated by Imperial (Sugar Land) to obtain relief from an alleged discrimination growing out of a reduction of certain interstate rates approved by the Interstate Commerce Commission. The order attacked at bar recites:

"The further reductions which have been made, effective generally in January, 1953, from the interstate sugar refining, producing and distributing points to Texas, have the effect of nullifying, in whole or in part, the revisions which were made in our former order, the rates under which were related to the reduced rates from the interstate origins to Texas as in effect at that time; and to that portion of Texas to which no reductions were made in the rates from Sugarland, but to which the rates from California have been further reduced, the situation as to rates from California and Sugarland to that part of Texas, has been worsened."

\* \* \* \* \*

"\* \* \* and upon further showing by complainant, that while previously it was 10c more attractive to California to sell sugar in Chicago than in Dallas, it is now 3c more attractive for California to sell at Dallas than in the Chicago market."

\* \* \* \* \*

"The widespread chaos, however, apparently was not feared when the rates were being reduced from California to Texas, and if so serious apparently could now be avoided by restoring the December 31, 1952 rates from California to Texas, and the January 14, 1953 rates from Louisiana, Colorado and the beet sugar area to Texas, it having been these reductions that brought about the complaint herein."

\* \* \* \* \*

"As a result of the two series of reductions which have

been made in the interstate sugar rates to Texas, and especially the reductions made in January, 1953, the Texas intrastate sugar traffic is called upon to bear a relatively greater proportion of the increases, or the Texas intrastate rates are subjected to relatively greater increases than is the interstate traffic or rates to Texas and certain intermediate territory."

\* \* \* \* \*

"We have heretofore found from the record herein that the rates from the several interstate producing areas to Texas as made effective in January, 1953, average 138.9% of the rates as were in effect on June 30, 1946, and using that as a base, the 60,000 pound minimum weight rates to be prescribed herein will be approximately 138.9% of the Texas intrastate rates as of June 30, 1946. While there are some variations, both over and under, the great preponderance of the 80,000 pound minimum weight rates that have been established from the interstate origins to Texas, are 8c less than the 60,000 pound minimum weight rates to the same points. The 80,000 pound minimum weight rates to be prescribed, and at this time limited generally to the same territory to which the 80,000 pound minimum weight rates were prescribed in our former order, will, therefore, be constructed on basis of 8c under the prescribed 60,000 pound minimum weight rates."

\* \* \* \* \*

"We further find from the evidence before us that the action of defendants, individually or in connection with their interstate connecting lines, involuntarily reducing the rates from the interstate origins to Texas, makes necessary the revisions of the Texas intrastate rates to be made herein \* \* \*."

\* \* \* \* \*

"The Column 2 rates prescribed in our former order to the socalled 28502 territory will also be canceled, as the reductions which have been made by defendants and their connecting lines in 1950, and again in January, 1953, in the interstate rates to Texas and some Oklahoma points have served to wipe out all semblance of the Docket 28502 adjudgment."

The Commission reasoned that the carriers voluntarily reduced certain interstate rates which it believed to be comparable to the rate in question; that the new intrastate rates would return greater earnings than comparable intrastate rates in

other areas; that the carriers were not getting all the bulk-sugar-hauling business available since some was being moved by private truck, an indication that the intrastate rates were too high; and that a reduction in rates may mean additional business for the carriers.

■ The State's regulatory power to fix intrastate rates is not automatically limited by a related interstate rate, for the court said in Simpson v. Shepard, 230 U.S. 352 (1913), 33 Sup. Ct. 747, 57 L. Ed. 1511:

"To say that this power exists, but that it may be exercised only in prescribing rates that are on an equal or higher basis than those that are fixed by the carrier for interstate transportation, is to maintain the power in name while denying it in fact. It is to assert that the exercise of legislative judgment in determining what should be the carrier's charge for intrastate service is itself subject to the carrier's will. But this state-wide authority controls the carrier, and it is not controlled by it; and the idea that the power of the state to fix reasonable rates for its internal traffic is limited by the mere action of the carrier in laying an interstate rate to places across the state's border is foreign to our jurisprudence."

■ Art. 6445 confers upon the Commission power and authority and it is made its duty to adopt all necessary rates, charges and regulations to govern and regulate the railroads, to correct abuses and prevent unjust discrimination in the rates, and in general to prevent any and all other abuses in the conduct of the railroads' business.

Art. 6448 provides that "The Commission shall:

"1.    Adopt all necessary rates, charges and regulations, to govern and regulate freight and passenger traffic, to correct abuses and prevent unjust discrimination and extortion in rates of freight and passenger traffic on the different railroads in this State.

"2.    Fairly and justly classify and subdivide all freight and property of whatsoever character that may be transported over the railroads of this State into such general and special classes or subdivisions as may be found necessary and expedient.

"3.    Fix to each class or subdivision of freight a reasonable rate for each railroad subject to this title for the transportation of each of said classes and subdivisions. * * *

' "6. From time to time, alter, change, amend or abolish any classification or rate established by it when deemed necessary. Such amended, altered or new classification or rates shall be put into effect in the same manner as the originals."

Art. 6457 provides:

"The Commission may at any time abolish, alter, or in any manner amend any such regulations; and in that event certified copies of the schedules, rules or regulations, showing the changes therein, shall be delivered to each road affected as herein specified. In all cases where the rates shall not have been fixed by the Commission, no changes shall be made, except after ten days' notice to and with the consent of the Commission."

■ Art. 6474 prohibits railroads from doing a number of acts which are declared to be unjust discriminations and imposes penalties upon the railroad found guilty. The Act does not apply to interstate commerce, and from this the railroads argue that the Commission cannot consider interstate rates in fixing intrastate rates. A charge of discrimination may be leveled in an effort to have a rate declared void or to collect a penalty, but in the case at bar it is given as one reason for changing a rate by the body having the rate-making function. The statute imposing penalties upon railroads was not intended to limit the rate-making function. The jurisdiction to penalize and the scope of facts to be considered in rate-making are two different things. We hold that when acting within its rate-making function the Railroad Commission can consider the structure of interstate rates and their effect upon intrastate rates. Railroad Commission v. Weld & Neville, 96 Texas 394, 73 S.W. 529. The general power and duty to fix rates comes from Art. 6445 et seq. Art. 6474 is not a limitation upon the scope of the inquiry to determine a correct rate.

The carriers cite the case of Missouri, K. & T. R. Co. v. Railroad Commission, Texas Civ. App. 1928, 3 S.W. 2d 489, affirmed in Producers Refining Co. v. Missouri, K. & T. Ry. Co., Texas Com. App., 13 S.W. 2d 679 and 680, for the proposition that "the Commission then did what it has done here, and so declared its purpose, to fix the Texas rate in relation to the interstate rate." That case was an attempt by a shipper to collect reparations through a Railroad Commission order from a a carrier for oil already shipped under a prescribed intrastate rate on the grounds of unjust discrimination by reason of a related interstate rate. The express holding was that a prescribed

intrastate rate was binding until set aside or changed and that a carrier was not liable for reparations as long as it charged the prescribed rate. The action of the Commission in attempting to award money reparations to a shipper under those circumstances is completely different from its legislative action here in changing an existing rate.

In the case of Texas Steel Company v. Ft. Worth & D. C. Ry. Co., 120 Texas 597, 40 S.W. 2d 78, it was held that a suit cannot be maintained in a state court against a railroad for penalties for discriminations growing out of interstate rates. That case does not hold that the Railroad Commission in fixing an intrastate rate may not consider the interstate rate structure both for comparative purposes and additionally for the purpose of making the intrastate rate consistent with the interstate rate. The case at bar is not a penalty suit. The two cases are not comparable although the Texas business concerns in both cases may have been suffering the same type of injury. The relief sought before the Railroad Commission in the matter at bar was a rate change while that case was a collateral attack in court on a rate order in which the relief sought was a penalty. For us to hold that the Texas Railroad Commission could not consider the interstate rate structure in fixing intrastate rates would be to blindfold that body and bring on many conflicts with the Interstate Commerce Commission.

The case of Railroad Commission v. Texas Steel Company, Texas Civ. App., 43 S.W. 2d 137, 143, error refused by Supreme Court of Texas, certiorari denied, 286 U.S. 562, 52 S. Ct. 644, 76 L. Ed. 1295, was an attack in the state courts upon an order of the Texas Railroad Commission refusing to grant relief against intrastate rates and against a 2-cent fabricating-in-transit privilege prescribed in a related interstate rate by the Interstate Commerce Commission. The trial court had "found that the Interstate Commerce Commission had no authority to prescribe the 2-cent transit privilege plus differential as intrastate rates * * *." The Court of Civil Appeals first held:

"The record as presented shows that the Interstate Commerce Commission made no basic or essential findings to support its order, or for its jurisdiction to establish or authorize the 2-cent transit privilege plus differentials as intrastate rates on iron and steel articles moving wholly within this state as intrastate business, in order to end an unjust discrimination as against intrastate commerce either as between persons and localities, or because of an undue burden upon the income of the

carriers. However, only excerpts of the order of the Interstate Commerce Commission and its proceedings in the Consolidated Cases hearing are in evidence, and we reverse and remand the cause for a fuller development of the case in this regard. If it be found after a full hearing of the issue that the Interstate Commerce Commission failed to make basic or essential findings to support its order and jurisdiction for entering the state field under the rules stated by Chief Justice Hughes in the case of Florida v. United States, supra, its order establishing the 2-cent transit privilege plus differentials as intrastate rates is wholly void, and the district court may enjoin the carriers from collecting same, and from using the said transit privilege in connection with interstate rates on iron and steel articles. * * * "

On rehearing this was reversed. The specific final holding was that "suits raising issues of discrimination growing out of such rates can be maintained only in federal courts after the matter has been presented to the Interstate Commerce Commission."

This is not a holding that the Railroad Commission cannot consider a related interstate rate while acting legislatively in prescribing rates. A study of the entire opinion inclines us to the belief that the "such rates" referred to as being reviewable only in suits in the federal courts were the interstate rates under attack. The first judgment remanded for further proof of the basis of the Interstate Commerce Commission's order prescribing them. On rehearing this was changed to a rendition on the grounds that this was exclusively a federal question. In that case the Texas Railroad Commission had refused to alter the intrastate rate. This presents an entirely different question from the one at bar.

■ In short, the position of the carriers and out-of-state shippers seems to be that where an intrastate rate needs adjusting up or down by reason of a related interstate rates, this change can only be made by the Interstate Commerce Commission and cannot be made by the State Commission which promulgated the intrastate rate in the first place. We find no such jurisdictional restriction upon state government. Surely the Commission which promulgates an intrastate rate has the power to make adjustments in those rates. If its action should turn out to be a burden upon interstate commerce, this can be corrected by the Interstate Commerce Commission.

A brief filed by one appellant states the maintenance-of-competitive-relationship contention as follows:

"Through the years the primary concern of the sugar companies, Appellants and Appellees, has been to maintain a differential or absorption in all of their out of state markets on a basis which each could afford to do business in such market. The Interstate Commerce Commission in its orders granting general rate increases in the post World War II era (the ex parte proceedings) has recognized this relationship and in its orders has urged the carriers to maintain the competitive relationships. * * * "

Is such a policy determination binding on the Texas Railroad Commission? Is it the duty of the Railroad Commission to stabilize competitive relationships as of June 30, 1946?

At that time, for example, Sugar Land had a competitive advantage in freight costs in sugar sold at Dallas of thirteen cents per 100 pounds over New Orleans, a forty cents per 100 pounds advantage over Colorado. In the order under attack, the Railroad Commission has lowered the intrastate freight rate from Sugar Land to Dallas and so has changed this competitive relationship. This reduction of intrastate rates lowers the prepay and this in turn will lower the sales price of sugar in Dallas and may give sugar consumers in Dallas cheaper sugar. The Colorado beet sugar refineries claim this to be a burden on interstate commerce. They will have to meet the lower price of sugar in Dallas, and since the interstate freight rates will remain the same, this will increase the amount of absorption and correspondingly reduce their profit. They say in their briefs that they doubt that they can absorb this additional amount. This will make the Dallas market less attractive to them and it could mean that they will cease or materially reduce their business in Dallas.

To the railroads this reduction means a loss of revenue on sugar shipped intrastate in Texas but no direct change in revenue on sugar shipped into Texas. However, the order could reduce the total amount of sugar shipped into Texas and correspondingly increase the intrastate shipments within Texas if the out-of-state refineries elect to terminate or reduce their Texas business rather than absorb the reduction in the selling price of sugar. So the benefits of this rate reduction fall directly to the Texas consumer and indirectly to the Texas sugar refineries by reason of reducing the profit margin of their com-

petitors.. The order hurts directly the railroads by reducing their revenue on intrastate sugar hauls and may hurt them indirectly by reducing the volume of interstate sugar hauls. It can be a burden on interstate commerce if its effect is to throw an undue share of the carrier's operating expense upon their interstate revenues.

■ The carriers and out-of-state intervenors did not obtain a finding in the trial court that the new rate would be a burden upon interstate commerce. This record does not establish this as a matter of law. Neither did they obtain a finding that the new rate was discriminatory as to out-of-state shippers. The Railroad Commission is under no duty to maintain a high sugar price in Texas in order to allow out-of-state shippers to compete. Of course there is an advantage in being near a market and by reason of this having less cost of hauling than does a competitor. Freight rates should not be used as a price-fixing device.

■ A pricing scheme which included an allowance for shipping sugar from Hawaii to Louisiana in order to allow an Hawaiian sugar company to compete in Louisiana would seem to allow the Louisiana producers a large profit at the expense of the public. If such an arrangement were maintained all over the United States it would allow each sugar refiner a much larger profit in its "home" territory. Any such primary concern of the sugar companies which found its way into an express agreement would be dangerously close to violating the antitrust laws. The freight rate structure should not be used as a cloak behind which to hide a possible antitrust violation. Freight rates should be fair and nondiscriminatory between shippers similarly situated and between geographical locations. They should be based upon the carrier's cost of operation plus a fair profit. Any greater charge would constitute a subsidy to the carrier made for the purpose of favoring and protecting some industry or locality or maintaining an artificial price level and would constitute discrimination. The intrastate rates must bear their just share of the carrier's cost of operation. They must not shift part of the cost of hauling intrastate freight into the rates for interstate commerce and thus be a burden upon interstate commerce. The Railroad Commission has no duty to divide or prorate the sugar business between competitive shippers. It has no duty to fix intrastate freight rates above a level reasonably compensable to the carriers for the purpose of maintaining a sales price on sugar high enough to allow a distant shipper to compete at a profit.

■ In their Point 5 the carriers say that a previous general increase of 6% was under attack in court by the Texas Industrial Traffic League and that the Railroad Commission lost its power to consider changes in the rate structure while that case Texas Industrial Traffic League v. Railroad Commission, 255 S.W. 2d 903, 905, was pending. The order at bar did not involve the issues in that case, was dated subsequent to the order under attack in that case, and was not contingent upon the outcome of that case. It obviously was not an attempt to act upon a matter pending litigation since in the first order the Commission gave the railroads a general increase (later sustained in court) and the reasonableness of that increase was the question at issue there. Here the decrease is in one commodity upon complaint of a shipper not a party to that litigation. The pendency of that case could not deprive the Railroad Commission of its continuing power to supervise the rate structure and to make changes unconnected with the specific issues involved there.

In Point 6 the carriers urge that this order should be stricken because it is a burden upon interstate commerce and in "direct violation of the order of the Interstate Commerce Commission" Docket Number 28502.

We have examined the order entered in Docket No. 28502. There the Interstate Commerce Commission on August 3, 1942 found that the interstate rates then in effect between Sugar Land, Texas, and points in Southern Oklahoma were reasonable; that intrastate rates to points in Northern Texas just across the Oklahoma border were too low; and that the Texas intrastate rates constituted a burden on interstate commerce in that sugar was shipped by rail to North Texas and then by private truck to Southern Oklahoma cheaper than the interstate rate for the same distance. Although it found that the cheaper Texas intrastate rate was a burden on interstate commerce, the Commission issued no order upon this finding because the Texas Railroad Commission advised that it would make a revision.

■ Thereafter, on April 5, 1943, the Texas intrastate rates were adjusted upward to meet the requirements of the order in Docket No. 28502. During the period since April 5, 1943 there have been a number of changes affecting the relationship dealt with in Docket No. 28502. We hold that due to the interval of time involved and to the changes which have occurred since April 5, 1943, the intrastate rate under attack at bar does not violate the order in Docket No. 28502. If the carriers feel that this intrastate rate creates a burden on interstate shipments to

Southern Oklahoma, they have two remedies in addition to any relief which might be granted by the Railroad Commission. They may seek a voluntary adjustment downward of the interstate rates. Or they may initiate a "Section 13" proceeding U.S.C.A., Title 49, Part 1, Sections 13(3) and 13(4) before the Interstate Commerce Commission for the purpose of having the intrastate rate adjusted upwards in the affected territory. Board of Ry. Comm. of the State of North Dakota v. Great Northern Ry. Co. (1930), 281 U.S. 412, 74 L. Ed. 936, 50 Sup. Ct. 391; Railroad Commission of Wisconsin v. Chicago B. & Q. Railroad Co., (1922), 257 U.S. 563, 66 L. Ed. 371, 42 Sup. Ct. Rep. 232, 22 A.L.R. 1086; Lutcher & Moore Lumber Co. v. Beaumont, S.L. & W. Ry. Co., Texas Com. App. 1932, 49 S.W. 2d 726; Atchison, Topeka & Santa Fe Ry. Co. v. Illinois Commerce Comm., (1929), 335 Ill. 70, 166 N.E. 466.

Right from the start, the trial court faced a dilemma. Should the case be tried under the substantial evidence rule or by a preponderance of the evidence? This dilemma arose from a conflict between the case of Lone Star Gas Co. v. State, 137 Texas 279, 153 S.W. 2d 681, requiring a preponderance burden and the following cases applying the substantial evidence rule: Consolidated Chemical Industries, Inc. v. Railroad Commission, Texas Civ. App. 1947, 201 S.W. 2d 124, error ref. n.r.e.; Angelina & Neches River R. Co. v. Railroad Commission, Texas Civ. App., 246 S.W. 2d 928; and Texas Industrial Traffic League v. Railroad Commission of Texas, Texas Civ. App. 1953, 255 S.W. 2d 903, error ref., n.r.e.

In response to an objection to the tender of evidence of certain cost data, the Court made the following ruling:

"THE COURT: In so far as the objection is concerned as to the particular subject matter, let me preface my ruling with this observation: the petitioners have pleaded, as I have viewed their pleadings, on two theories. I don't know that they have subordinated one to the other. One is under the substantial evidence rule and the other is on the pure trial de novo theory. Under the substantial evidence rule, the petitioner has a positive negative burden, if you get what I mean. I don't know whether I do or not, but the allegations over all of no evidence upon which the order could be based is one which nearly opens up the matter of evidence in the trial court, if it is tried on the substantial evidence theory, on almost anything that has anything to do with rates or operations.

"It is a peculiar thing that they have a burden which in or-

dinary parlance and in ordinary understanding of the English language is an impossible burden, but the Supreme Court has ruled it to be a possible burden by having established the rule itself, and so the rule is a positive but negative rule, and under that theory I will overrule the objection and let them go into it in that regard.

"MR. RICHARDS: Now then, Your Honor, do I understand this Court is now conducting the trial of this case under the substantial evidence rule?

"THE COURT: I am conducting the trial on any theory pleaded by the plaintiffs. There is another burden on the petitioner; he has the burden of establishing any theory or any combination of theories that he feels he can stand on. I don't know whether he has to elect after he presents his case and I don't think probably he does except in so far as it develops. I will allow him to go ahead on that basis."

At the termination of the trial, the Court included in his conclusion of law the following:

"This being a review of action of the Railroad Commission under Article 4653, V.C.S., the judicial review of the Commission's action herein is under the precepts of the substantial evidence rule, as it is defined and recognized in the jurisprudence of this State and evidence otherwise considered to have been inadmissible was received on the theory that the substantial vidence rule applies. Findings of fact based on a preponderance of the evidence have been made, however, and the conclusions of law herein are the same whether or not the substantial evidence rule governs this case."

■ We hold that the substantial evidence rule should not have been applied and reaffirm our holding in the Lone Star Gas case that fact issues at bar should be resolved according to a preponderance of the evidence.

■ The fixing of freight rates is by its very nature legislative. Simpson v. Shepard, 1913, 230 U.S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511; Railroad Commission v. Houston & T.C. Ry. Co, (1897), 90 Texas 340, 38 S.W. 750, 756; Railroad Commission v. Weld & Neville, (1903) 96 Texas 394, 73 S.W. 529; Gulf C. & S.F. R. Co. v. Railroad Commission, (1909), 102 Texas 338, 113 S.W. 741; 116 S.W. 795; Railroad Commission v. Houston Chamber of Commerce, 124 Texas 375, 78 S.W. 2d 591; Missouri,

K. & T. R. Co. v. Railroad Commission, 1928, Texas Civ. App. 3 S.W. 2d 489, affirmed Texas Com. App., 13 S.W. 2d 679.

· Art. 10, § 2, Texas Constitution, provides:
"* * * The Legislature shall pass laws to regulate railroad, freight and passenger tariffs, to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state, and enforce the same by adequate penalties; and to the further accomplishment of these objects and purposes, may provide and establish all requisite means and agencies invested with such powers as may be deemed adequate and advisable."

Under Arts. 6445 and 6448, V.A.C.S., fixing rates is a function and duty of the Railroad Commission. But under the separation and division of powers doctrine — still our basic and fundamental guarantee of liberty — the Legislature has charged the judiciary by Art. 6453, V.A.C.S., with examining an order of the Railroad Commission upon complaint of a dissatisfied party and, under Art. 6454, V.A.C.S., the burden of proving that the rates complained of are "unreasonable and unjust to it or them" is placed upon the complaining party.

In Producers Refining Co. v. Missouri, K. & T. Ry. Co. of Texas, Texas Com. App. 1929, 13 S.W. 2d 679, 680, 682, a suit for reparations for freight collected under an order of the Railroad Commission fixing a rate alleged to be too high and discriminatory, we held that the Railroad Commission cannot pass a judicial-type judgment upon its own legislative order. This Court said:

"In our opinion, it was never contemplated that the Railroad Commission should be placed in the unenviable position of determining as to whether its rates duly established are unjust and discriminatory. We think the article of the statute above quoted was enacted for the express purpose of making the rates fixed by the Railroad Commission binding and conclusive upon all parties until they were set aside by a proceeding in the district court as provided in articles 6453 and 6454, R.S. 1925."

This Court then went on to point out the difference in function between the Interstate Commerce Commission and the Texas Railroad Commission, saying:

"The plausible argument is made that the federal system of

permitting reparations to be awarded by the Interstate Commerce Commission is analogous to the right claimed in this case. There is a fundamental difference, however, between the federal and the rate-making system of our state. Under the federal system, the Interstate Commerce Commission does not fix the rates charged by the carrier. Under the Transportation Act, the carrier is commanded to fix rates that are just, reasonable, and nondiscriminatory. In the light of this admonition, they fix their own rates by filing schedules thereof with the Interstate Commerce Commission. It is only when a complaint is made by the carrier or a shipper that the Interstate Commerce Commission is authorized to ascertain whether a rate is fair, just, and reasonable, and to determine what is a just and fair rate. Under our system the rate is not determined by the carrier, but is fixed by a tribunal created for the very purpose of establishing reasonable and nondiscriminatory rates. The Interstate Commerce Commission only awards reparations when it finds that a rate fixed by the carrier itself is unjust or discriminatory. Of course it was not contemplated under the federal system that the carrier could fix a rate that would be binding and conclusive upon the shipper. This would enable the railway company to do the very thing which it was the policy of the law to prevent — the charging of extortionate and discriminatory rates. A different rule, however, applies where the rates in the first instance are fixed by a tribunal upon whom is imposed the public duty of fixing freight rates fair and just to the carrier and the shipper."

In Railroad Commission v. Houston Chamber of Commerce, supra, this Court said:

"* * * the making of rates is a legislative function, but the determination as to whether a rate is unreasonable or for any reason is illegal is a judicial function * * *.

"* * * On the question of burden of proof required by statute when an order of the Railroad Commission is attacked directly, the statute (article 6454, Rev. Stat. 1925) now reads: 'The burden of proof shall rest upon the plaintiff to show the rates, regulations, orders, classifications, acts or charges complained of are unreasonable and unjust to it or them.'

"The codifiers of the 1925 revision left unchanged article 6658 of the Rev. Stat. 1911 (which in turn was article 4566 of the Rev. Stat. 1895) on the subject, except the omission after the word 'show' of the words 'by clear and satisfactory evi-

dence'; under the statute now in force the controversy must therefore be determined, so far as the 'burden of proof' is concerned, by the same rules governing in ordinary civil cases." (124 Texas, 375, 87 S.W. 2d 595).

■ The carriers contend also that this order is void because the Commission made no finding that the old rate was "* * * unjust, unreasonable, discriminatory, prejudicial or otherwise illegal, and without finding the new rates just, reasonable and fair * * *," citing Thompson v. Railroad Commission, 150 Texas 307, 240 S.W. 2d 759. That case involved an attack upon a specialized motor carrier permit issued under Art. 911-b. Section 5a(d) of Art. 911-b provides that the Commission's order shall be void "* * * unless the Commission set forth in its order full and complete findings of fact * * *." There is no such provision in the statutes governing the rate making function for railroads and we cannot insert it into the statutes by judicial fiat.

■ By their Point 7 the carriers contend that the new rate is unreasonable and unjust as to them in that the order will substantially reduce their annual revenue and is noncompensable in that it will not give them a fair return. Although appellees claim that the carriers did not plead that the rate was not compensatory, we believe that if given a liberal construction their pleading will support this Point.

Having failed to obtain favorable findings of fact in the trial court, the carriers have the burden on appeal of showing that the order of the Commission is as a matter of law either confiscatory or unreasonable and unjust.

The evidence offered by the railroads on this issue, as summarized by them in their application for writ of error, comes to this: In February 1952 the Railroad Commission granted a general rate increase of 6% on intrastate freight. The railroads' unit operating expense items were grater in August 1953 than they were in February 1952. Although their total investment had increased from $863,197,002 in February 1952 to $872,-642,806 in July 1953, their net operating income had decreased from $3,998,668 to $3,533,303, and their rate of return from 5.56% to 4.86% in the same period. An operating ratio of cost to income not exceeding 70% is necessary in the railroad industry to a sound financial condition, and while that ratio was 72.49 in February 1952, it was 77.44 in July 1953. Under the proposed reduced rates on sugar the carriers will lose, annually, in excess of $284,000. Charges under the new rates from Sugar

Land to many points in Texas will be even lower than they were in 1928. One witness knew of no reason why this should be so.

The railroads offered no evidence to show that the new rates on sugar, if considered alone, are noncompensatory. Their position on this phase of the case is that if their entire intrastate operations do not show a reasonable return on investment, or if they show an unreasonable operating ratio of cost to income, the Commission is powerless to reduce the rates on a single commodity, citing Railroad Commission v. Weld & Neville, 96 Texas 394, 73 S.W. 529; Smyth v. Ames, 169 U.S. 466, 42 L. Ed. 819, and Simpson v. Shepard, (Minnesota Rate Cases), 230 U.S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511. These authorities are not controlling.

In the Weld & Neville case suit was against the Railroad Commission to compel it to grant a lower rate on round-bale cotton than was fixed for cotton shipped in flat bales. The relief sought was desired. The court said that in refusing to fix a lower rate for round-bale cotton the Commission had a right to consider the entire business operations of the railroads and that some commodities would have to be transported at a loss. That is not a holding that the Commission cannot lower a rate on a particular commodity because by virtue of the reduction the railroads would lose revenue.

In Smyth v. Ames state authorities were enjoined from enforcing against railroads in Nebraska a general statutory reduction of 29½% in freight rates. The evidence showed that if the reduced rates had been in effect during any of the preceding three years most of the roads would have operated at a loss and the income of the few operating at a profit would have been so small as to compel the conclusion that they were forced to use their property without just compensation.

In Simpson v. Shepard the Supreme Court of the United States affirmed an injunction against two orders of the Railroad & Warehouse Commission of the State of Minnesota and two acts of the legislature of that state which fixed general schedules of maximum charges for freight and passenger transportation. The injunction was granted upon a showing that the rates prescribed would have made a very serious reduction in a return already inadequate.

Thus it appears that in both Smyth v. Ames and Simpson v. Shepard the injunction ran against enforcement of orders

and statutes for general rate reductions which would have resulted in depriving the railroads of a reasonable and just return on their investment. There is nothing in either of the cases which deprives a rate-making agency of the authority to reduce rates on a particular commodity simply because the reduction will result in a loss of revenue to railroads whose return on investment is already low. Unless the rate fixed on the particular commodity is unreasonable and unjust, the railroads should not be heard to complain of it simply because it results in a loss of revenue. They have their remedy under the statutes in seeking a general revenue increase in rates.

■ The admission of comparable rates offered for comparison was error without proof of comparable operating conditions. Railroad Commission v. Weld & Neville, supra; Moline Consumers' Co. v. Ill. Commerce Comm., 353 Ill. 119, 187 N.E. 161. The comparisons did show some aspects of similarity, such as loading characteristics, value, damages and the revenue in terms of ton-miles and car-miles. They did not show comparable cost factors. Although the degree to which comparative data are truly comparable and the degree to which they differ may be a matter going to the weight of the testimony, still a basis for evaluating the comparison should be established before the comparative data are admitted in evidence. But since this was a nonjury trial, we do not consider this to have been reversible error.[1]

■ The question has been raised by members of the Court as to whether Art. 1738-a allows a direct appeal from the trial court to this Court in a case like the present. In the opinion of the majority this question is foreclosed in favor of direct appeal by Railroad Commission v. Sterling Oil & Ref. Co., 147 Texas 547, 218 S.W. 2d 415, and Railroad Commission v. Shell Oil Co., 146 Texas 286, 206 S. W.2d 235. The effect of these decisions was, incidentally, to modify the contrary implication of Sec. (c) of Rule 499-a, Texas Rules of Civil Procedure.

By their Points 8 and 9 the carriers allege that the 80,000

---

[1] Due to the public interest in both the solvency of the railroads and in not paying excessive freight rates (Abilene & So. Ry. Co. v. Terrell, 1939, Tex. Civ. App., 131 S.W. 2d 37, er. ref.), the writer would prefer to reverse and remand in order that all parties might focus on establishing their contentions by relevant evidence properly supported so that a true comparison might be drawn and comparative rates truly evaluated. Evidence "otherwise considered to have been inadmissible" was received in volume. It would be virtually impossible for the trial court to exclude from his thinking the total effect of this evidence. Under these circumstances, and considering the length of the trial, I feel that this testimony probably did enter into the trial court's judgment.

rates are discriminatory as between certain cities in Texas. Neither those cities nor anyone else affected by the alleged discrimination are parties to this case. Therefore, on this aspect of the new rate, this case is not a true adversary proceeding. For this reason we do not decide those points and do not adjudicate the question.

The judgment of the trial court is affirmed.

Opinion delivered November 16, 1955.

MR. JUSTICE CULVER dissenting.

I do not agree with the result reached in this decision. I would reverse because it appears to me that the action of the Railroad Commission in reducing the intrastate rate on sugar is arbitrary, unreasonable and not based on any evidence of a probative force.

The railroad carriers are here caught in a vise between large sugar refineries, domestic and out-of-state, contending for the Texas market and particularly that of the Dallas-Fort Worth area. The appellee (Imperial of Texas) applied to the Railroad Commission for a reduction of the intrastate rate. Imperial was not complaining of the intrastate rate. It was complaining of the relationship between the interstate and intrastate rates. It claimed that a slight reduction in the interstate rates applying to sugar moving into Texas gave the out-of-state refiners undue advantage.

As far back as 1946 the advantage enjoyed by Imperial to the Dallas market in the way of railroad rates over out-of-state shippers was forty cents per hundred. On account of certain adjustments in rates this advantage had been increased to forty-two cents. In 1953 the Interstate Commerce Commission approved a rate structure which reduced this advantage back to the forty cents which prevailed in 1946. Upon this application by Imperial the Railroad Commission not only reduced the intrastate rate so as to restore the two cents, but gave to Imperial a total of forty-nine cents advantage over the California shipper and a corresponding adjustment in the advantage held by Imperial over the Colorado refiners. For example, the distance from Sugar Land to Amarillo is 172 miles greater than from Denver to Amarillo. Under the present rates the difference is six cents in favor of the Colorado shipment. Under the intrastate rate now established by the Railroad Commission that is

reversed so as to give a six cents differential in favor of Sugar Land. Dalhart is 312 miles nearer Denver than it is to Sugar Land. The present rate is eleven cents in favor of Denver. The rate established by the Railroad Commission is two cents in favor of Sugar Land. Lubbock is only 36 miles nearer Sugar Land. The present rate gives Sugar Land an advantage of 10.4 cents, but the proposed rate more than doubles Sugar Land's advantage.

Seemingly appropriate here are the words of Circuit Judge Huxman in State Corporation Commission of Kansas v. U.S., 128 Fel. Supp. 746, (D.C.P. Kans. 1954):

"While relative distances from a common market is not the only factor to be considered in determining fair rates between competitors for a share of a common market, they are of major importance where the distances are approximately the same and general conditions are likewise comparable, and they may well be controlling in determining the reasonableness or unreasonableness of rates between competitors in the absence of other persuasive factors."

The basic question, it seems to me, before this court is: Can the Railroad Commission lawfully fix and relate intrastate rates to interstate rates? Certainly the Railroad Commission has the right to consider all applicable factors in fixing intrastate rates, including the level of interstate rates, but I think it does not have the power to lower intrastate rates solely on the ground of a reduction in interstate rates that has been approved by the Interstate Commerce Commission. Louisville & N. R. Co. v. Eubank, 184 U.S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416; Houston, E. & W. T. R. Co. v. U.S. 234 U.S. 342, 34 Sup. Ct. 833,, 58 L. Ed. 1341; Swift & Co. v. Philadelphia & R. R. Co., 58 Fed. 858. If the Commission does have that power then it can be said to regulate, somewhat, interstate freight rates and hamper the movement of goods in interstate commerce.

The proof that the rate relationship was the sole factor considered by the Railroad Commission in entering the rate reduction, is best shown by the language of the Commission's order as set forth in the majority opinion and particularly as follows:

"We further find from the evidence before us that the action of defendants, individually or in connection with their interstate connecting lines, involuntarily reducing the rates from the interstate origins to Texas, makes necessary the revision of the Texas intrastate rates to be made herein. * * *."

Some stress seems to be laid by the Commission and by the respondents on the fact, as they say, that this was a voluntary reduction by the railroads in the interstate rate. Whether it be voluntary or not would not seem to be immaterial as the railroad pursued the only method appropriate and the reduction was approved by the Interstate Commerce Commission. On the other hand the carriers point out that the interstate rate reduction, the basis of Imperial's complaint, was made to comply with the criticism by the Interstate Commerce Commission that rate relationship as of June 30, 1946, should be restored. The Commission said:

" 'We have the assurance of the petitioners of their intention to proceed by *voluntary discussion* and *cooperation* with the shippers and representatives of markets to endeavor to put into effect such measures as will restore former competitive relationships as completely as possible. We expect full and prompt compliance with these representations, in the spirit of the proceeding. Restoration of rate relationships should not be made the excuse for further increasing revenue or of bettering the competitive position of the carriers.' "

This must have had the effect of making the interstate reduction by the railroad carriers something less than voluntary.

In a case heavily relied upon by appellees, Atchison, T. & S. F. Ry. v. Illinois Commerce Commission, 1929, 335 Ill. 70, 166 N.E. 466, the general rule is said to be:

"It is of course true that the Illinois Commission has no power to regulate interstate commerce or to change and fix the relation between interstate and intrastate commerce rates. * * *"

In view of this reduction of intrastate rates by the Railroad Commission, the out-of-state shippers, in order to preserve the relationship which had existed for many years, are demanding further interstate reductions. Emphasizing again the only factor, namely, rate relationship, which, I think, caused the intrastate rate reduction the Commission pointedly said in its order:

"* * * If such further demands are made by intervenors, and defendants in connection with their connecting lines accede thereto by further reducing the interstate rates to Texas, seemingly the time will have arrived for a general investigation into the rates on sugar, carloads. Such an investigation would properly embrace the matter of rates on sugar in carloads from

Texas to California and the territory intermediate Texas to California, and from Texas to Louisiana, to which the evidence shows that the rates from Texas are on a much higher level than from California to the territory west of Texas, including California, and than from the New Orleans refining group to points in Louisiana. A mileage scale of rates might be the solution."

In other words, if from pressure brought by the out-of-state shippers or by the I.C.C. any further reduction is made of the interstate rates to Texas the Railroad Commission will *really* make a reduction, and it is implied that further reduction in the intrastate rates will be in order unless something is done about the rate from Texas to California.

Bearing further on this point the railroads show that under the new intrastate rates fixed by the Railroad Commission the charges for transporting sugar from Sugar Land, Texas, (Imperial Refinery) will be lower to many points in Texas than the rates were in 1928, and this in spite of the greatly increased cost of carrier operation during these more than twenty-five years and no change in economic conditions which would warrant that situation.

Appellees contend that even if the Commission did fix and relate the intrastate rate to the interstate rate, nevertheless the only relief for the railroad carriers would be an application to the Interstate Commerce Commission under Section 13 of the Interstate Commerce Act for a finding that the intrastate rates are too low and constitute a burden upon interstate commerce. While admittedly this action is available to the carriers, I think it is not exclusive for the reason that the statutory authority under which the Railroad Commission acts does not empower it to revise rates upward or downward depending solely upon the level or unreasonableness of interstate rights.

It may be said that the same avenue was open to appellee, Imperial, to correct any discrimination exerted by the interstate rate. Indeed Imperial first took that course. It applied to the I.C.C. to suspend the interstate reductions on the ground of unfair discrimination. Upon a denial of that relief Imperial did not pursue this protest further, although it could have had its complaint examined after formal application filed in accordance with the Commission's general rules of practice.

I think the Railroad Commission used the wrong measuring stick and therefore its order should not stand.

Rehearing overruled February 15, 1956.