**MORGAN EXPRESS, INC., et al., Appellants,**

**v.**

**RAILROAD COMMISSION OF TEXAS, et al., Appellees.**

No. 3–87–088–CV.

Court of Appeals of Texas, Austin.

Dec. 23, 1987.

Rehearing Denied March 9, 1988.

Mistletoe Tex–Pack Exp., Inc., Northern Tex–Pack Exp., Inc., O & A Tex–Pack Exp., Inc., Southeast Tex–Pack Exp., Inc., and Western Tex–Pack, Inc.

Frank C. Brooks, Dallas, for Purolator Courier Corp.

Sam Hallman, Leroy Hallman, Dallas, for Trailways, Inc., Trailways Bus System, Inc., American Buslines, Inc., Trailways of Texas, Inc., Midwest Buslines, Inc., Trailways Southern Lines, Inc., Continental Panhandle Lines, Inc., and Mistletoe Exp. Service.

Philip Robinson, Dan Felts, Mert Starnes, John R. Whisenhunt, Robinson, Felts, Starnes, Angenend & Mashburn, Austin, for Central Freight Lines, Inc.

Jim Mattox, Atty. Gen., Douglas Fraser, Asst. Atty. Gen., Austin, for R.R. Com'n of Texas.

Joe M. Kilgore, B.D. St. Clair, McGinnis, Lochridge & Kilgore, Austin, Irving R. Segal, William M. Barnes, Philadelphia, Owen T. Kinney, McElroy, Williams & Sullivan, Austin, for UPS, Inc.

Before POWERS, BRADY and ABOUSSIE, JJ.

POWERS, Justice.

The judgment of the district court upholds a final order of the Texas Railroad Commission establishing a tariff or schedule of rates and charges applicable to the intrastate transportation of packages by United Parcel Service, Inc. ("UPS"), a motor carrier subject to Commission regulation. In an appeal brought by numerous competing carriers, we will affirm the district-court judgment.[1]

UPS filed in the Commission an application to establish a tariff of official rates, charges, and rules for the transportation of

Joe K. Longley, Longley & Maxwell, Timothy J. Herman, Herman, Spellings & DeShazo, Austin, for Morgan Exp. Service, Inc., Beaver Exp. Service, Inc., Bluebonnet Exp., Inc., Liberty Tex–Pack Exp., Inc.,

1. Appellants are Morgan Express, Inc., O & A Tex–Pack Express, Inc., Bluebonnet Express, Inc., Southeast Tex–Pack Express, Inc., Northern Tex–Pack Express, Inc., Liberty Tex–Pack Express, Inc., Mistletoe Tex–Pack Express, Inc., Beaver Express Service, Inc., Western Tex–Pack, Inc., Trailways, Inc., Trailways Bus System, Inc., American Buslines, Inc., Trailways Texas, Inc., Midwest Buslines, Inc., Trailways Southern Lines, Inc., Continental Panhandle Lines, Inc., Mistletoe Express Service, Purolator Courier Corp., Common Carrier Motor Freight Association, Inc., Central Freight Lines, Inc., Merchants Fast Motor Lines, Inc., Red Arrow Freight Lines, Inc., and Pony Express Courier Corp. Appellees are the Texas Railroad Commission and United Parcel Service, Inc.

general commodities between all points in Texas. Examiners held hearings on the application and eventually recommended, in their proposal for decision, that the application be granted with a few minor changes. Thereafter, the Commission, over the dissent of one of its members, issued a final order establishing the tariff and adopting the majority of the proposed findings of fact and conclusions of law, together with additional findings of fact made by the Commission. The Commission unanimously denied the motion for rehearing and the order became final for purposes of judicial review.

Appellants sued for judicial review pursuant to Tex.Rev.Civ.Stat.Ann. art. 911b, § 20 (1964) and Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19 (Supp.1987) (hereinafter "APTRA"), praying that the Commission's findings, conclusions, and decision be reversed and the cause remanded to the Commission. The district court sustained the agency order and from that judgment appellants bring this appeal.

## MOTOR–CARRIER RATEMAKING IN THE COMMISSION

The Legislature entrusted to the Commission the power, authority, and duty to "supervise and regulate" the commercial carriage of freight by motor vehicle within the State. Tex.Rev.Civ.Stat.Ann. art. 911b, § 4(a) (Supp.1987). To that end, the Commission exercises three basic regulatory functions: (1) licensing; (2) rulemaking; and, (3) establishing official amounts that the carriers must charge for their services.[2]

Concerning the ratemaking function, the Legislature has directed that the Commission "fix, prescribe or approve the maximum or minimum or maximum and minimum rates, fares and charges of each motor carrier in accordance with the specific provisions herein contained...." Art. 911b, § 4(a). We are able to ascertain only two such "specific provisions": (1) the Commission must "establish collective ratemaking procedures for all commodities and services for which it prescribes rates, charges, and classifications...."; and, (2) these procedures must enable the Commission to ascertain "the respective revenues and costs of carriers engaged in the transportation of the particular commodity or service for which rates are prescribed...." Art. 911b, § 4(a).[3] Beyond these two provisions, the Legislature appears to have giv-

---

**2.** In art. 911b, § 4(a), the Legislature declares that "[t]he Commission is hereby vested with power and authority ... to fix, prescribe or approve the maximum or minimum or maximum and minimum rates, fares and charges of each motor carrier...." This provision is, of course, directly applicable to the setting of official motor-carrier rates.

Outside the scope of art. 911b, however, we find other instances where the Legislature has responded to the constitutional directive that it "pass laws to regulate railroad, freight and passenger tariffs, to correct abuses and prevent unjust discrimination...." Tex. Const.Ann. art. 10, § 2 (1955). See, e.g., Tex.Rev.Civ.Stat.Ann. arts. 6445, 6448 (1926).

The rates, fares and charges established by the Commission are *official* rates, promulgated after hearing and determination, generally on application by carriers or shippers. Thus, the theory of ratemaking before the Commission is different from that followed in the Interstate Commerce Commission with respect to the interstate carriage of freight by motor carriers. See Note, *Current Problems—Administrative Government in Texas,* 47 Texas L.Rev. 805, 828–835 (1969).

Because the statutory norms and standards are basically the same for railroad and motor-carri-

er rates, fares, and charges, it is customary to use precedents from either field, irrespective of whether the rates are those of a motor carrier or a railroad, in cases involving the Commission's exercise of the ratemaking function. *See, e.g., Oil Field Haulers Ass'n v. Railroad Commission,* 381 S.W.2d 183 (Tex.1964).

**3.** At the time hearings were held in the present case the following Commission rule was in effect:

**§ 5.148. Rate–Making Standards.**
(a) *Generally.* Rates set by the commission must be reasonable to the shipping public and compensatory to involved carriers as a group.
(b) *Accessorial rates and charges.* Accessorial rates and charges shall be set at a level which will cover the operating cost of involved carrier or carriers as a group.
(c) *Rates and charges other than accessorial rates and charges.* Rates and charges other than accessorial rates and charges shall be set at a level which will cover the operating expenses of involved carrier or carriers as a group and provide a reasonable margin in excess of operating expenses from which involved carrier or carriers as a group shall derive a reasonable return.

en the Commission the widest *discretion* in the techniques and procedures it may employ in arriving at the official rates and charges necessary to accomplish the objectives of the Legislature: providing a complete system of transportation services sufficient for the needs of the State as a whole and the protection of that system from unfair, discriminatory, or destructive competition that might impair its usefulness. *Oil Field Haulers Ass'n v. Railroad Commission*, 381 S.W.2d 183, 192–195 (Tex. 1964); *see also* art. 911b, § 22b ("Declaration of Policy").

In addition to giving the Commission great discretion in ratemaking, the Legislature has contemporaneously furnished the agency with the means and facilities necessary to perform that function intelligently and expertly. *See, e.g.*, art. 911b, § 13b (Commission may require carriers to maintain accounting systems and make reports), §§ 14, 15 (Commission may compel attendance of witnesses at hearings), and § 19 (Commission may employ experts in addition to regular staff).

■ Ratemaking may be an enormously complicated matter requiring the Commission to ascertain the existence, absence, and interaction of any number of factors. These factors may vary from case to case and from time to time, requiring perhaps a different orchestration in each instance. Such factors might be: the value of a carrier's properties devoted to common-carrier service; its earnings and expected earnings; its costs and expected costs; the mileages involved in a particular service; the kind, value, and volume of traffic; how fixed and variable costs are to be fairly distributed and recovered; the times and frequency of shipper demand; the variables of competition; and, so forth. *Angelina & Neches River Ry. Co. v. Railroad Commission*, 246 S.W.2d 928, 931 (Tex.Civ. App.1952, no writ); S. Breyer, *Regulation and Its Reform*, at 36–59 (1982).

■ We may infer a few precepts from the reported judicial decisions that deal with the Commission's exercise of the ratemaking function. The competitive relationship between rail and motor carriers

must be considered where applicable, that being a factor important to the legislative purpose of creating a complete transportation service throughout the State. *Oil Field Haulers Ass'n v. Railroad Commission, supra.* Rates should be fair and nondiscriminatory between shippers similarly situated and between geographical locations; they should be based upon the carrier's cost of operation plus fair profit. *Id.* The Commission's discretion does not extend so far as to permit official rates that are "confiscatory" or force the carrier to recover something less than a reasonable return on its investment in properties devoted to common-carrier service. *Texas & New Orleans Railroad Co. v. Railroad Commission*, 155 Tex. 323, 286 S.W.2d 112, 117 (1955).

■ Wasteful and fruitless attempts at perfection are neither expected nor required in ratemaking, however, and the Commission is permitted to set "uniform rates based on operating costs and revenue requirements of a *representative sample* of the carriers, even though the rates may be noncompensatory to *some* of the carriers because of their higher costs of doing business." *Railroad Commission of Texas v. Southern Pacific Transport Company of Texas and Louisiana*, 649 S.W.2d 713, 714 (Tex.App.1983, no writ) (emphasis added). Moreover, the Commission has discretion to employ an "operating ratios method" for setting rates—that is, a formula comparing costs to revenues—provided there is reasonable support in the evidence for choosing that formula and the sums therein. *Texas Industrial Traffic League v. Railroad Commission*, 683 S.W. 2d 368, 369 (Tex.1985). *See generally* Note, *Current Problems, Administrative Government in Texas*, 47 Tex.L.Rev. 805, 828–835 (1969).

How the Commission exercises its discretion in a particular rate proceeding is governed by the rule of reasonableness in light of the legislative objectives behind art. 911b and the two specific ratemaking provisions in § 4(a). The rule of reasonableness is, of course, implicit in the very delegation

of the ratemaking power; but it is also explicit in the Legislature's provision for judicial review of the Commission's rate orders. Such orders may be reversed on judicial review if shown to be "unreasonable or unjust" to the complaining party. Art. 911b, § 20. The rule of reasonableness is also implicit in the "abuse of discretion" and "substantial evidence" grounds upon which a reviewing court may reverse agency orders under the provisions of APTRA, § 19(e)(5), (6).

In the context of these general principles applicable to ratemaking and the setting of other tariff amounts, we turn to consider appellants' points of error in the present appeal.

## LINE–HAUL RATES

The Commission's final order established the sums to be charged by UPS for the transportation of packages weighing one to fifty pounds and other sums for certain transportation-related services. The former sums are denominated "line-haul rates" and the latter are denominated "accessorial charges." Appellants assail both categories as being unreasonable. We shall first consider their attack on the line-haul rates.

The line-haul rates are based on a general theory that the rates must increase incrementally according to package weight and the distance the package is shipped. An extract from the rate schedule illustrates the typical increments employed:

| Weight | Zone | | | |
| | 2 | 3 | 4 | 5 |
| --- | --- | --- | --- | --- |
| Not to Exceed | 1–150 Miles | 151–300 Miles | 301–600 Miles | Over 600 Miles |
| 1 Pound | 1.23 | 1.32 | 1.46 | 1.52 |
| 2 | 1.24 | 1.34 | 1.63 | 1.73 |
| 3 | 1.32 | 1.48 | 1.80 | 1.95 |
| 4 | 1.40 | 1.61 | 1.97 | 2.16 |
| | | * * * * | | |
| 11 | 1.98 | 2.52 | 3.14 | 3.66 |
| | | * * * * | | |
| 48 | 5.03 | 7.18 | 9.36 | 11.58 |
| 49 | 5.12 | 7.31 | 9.53 | 11.79 |
| 50 | 5.20 | 7.43 | 9.69 | 12.00 |

Generally speaking, the rates increase eight or nine cents per pound in Zone 2; 12 or 13 cents per pound in zone 3; 16 or 17 cents per pound in Zone 4; and 21 or 22 cents per pound in Zone 5. The zones correspond generally to the "zip code" zones established by the United States Postal Service for use in its shipment of similar small packages. The tariff is based on four distance zones and 50 possible package weights, producing a total of 200 separate line-haul rates. Some of the appellants contend on appeal that the line-haul rates are unreasonable and that the Commission acted arbitrarily and capriciously in the manner in which the rates were set.

The Commission is legally bound to set motor-carrier rates that will permit a carrier recoupment of its costs together with a fair return. Traditionally, the Commission has met this legal requirement by first estimating the carrier's total cost of transporting the property in question. Based upon this estimate, the Commission then calculated the rates necessary to yield the carrier a total revenue equal to 110% of its total cost. Stated reciprocally, under the Commission's formula a carrier's cost of transporting its cargoes would be 90% of the revenue produced thereby. This is re-

ferred to as a "90 operating ratio." Appellants contend the Commission *did not* apply this historical "operating ratio" in the present case and acted arbitrarily and capriciously in failing to set forth its reasons for not doing so. Appellees contend the Commission *did* apply the "operating ratio" in the present case, albeit in a way dictated by the nature of the particular case and the evidence adduced.

The Commission found that UPS would carry an estimated 15,686,000 packages *annually* in its intrastate operations at a net cost of $39,273,221, certain savings being deducted from total cost; and, that the rate schedule (a portion of which is set forth above) would yield from intrastate operations a total revenue of $43,246,302. The "operating ratio" produced by these aggregate sums is 90.81, a number that approximates the historical "operating ratio" of 90.

The Commission also determined that UPS would carry an estimated 62,000 intrastate packages *daily;* that the average package weight would be 11 pounds; and, that the average cost of transportation would be $2.530 per package (based upon the average number of packages anticipated to be shipped to each of the four destination zones). From these, the Commission calculated that the average 11–pound package would yield an average revenue of $2.757 ($2.538 from the line-haul rate schedule plus $0.219 from other tariff charges). Comparing the average cost ($2.530) and average revenue ($2.757) produced an "operating ratio" of 91.8 for the intrastate carriage of an average package. This number also approximates the historical "operating ratio" of 90.

Finally, the Commission found that UPS' "combined nationwide" operations in 1984 resulted in an "operating ratio" of 90.97, a number comparable to the figures projected for the company's intrastate operations on an average and on an aggregate basis, as set out above.

If we understand correctly the briefs of the complaining appellants, they contend the Commission was bound to set *each* of the 200 rates on the basis of the 90 "oper-

ating ratio" being satisfied. This endeavor would have required, of course, an apportionment of the costs and revenues expected for each pound of package weight in each of the four zones, with corresponding distinctions in the evidence. No such proof was attempted in the case and, as indicated, the Commission substituted *uniform* increments, generally speaking, within each zone and for each pound of package weight. The issue reduces to whether the Commission was legally required to follow the course suggested by appellants or whether it lay within the agency's discretion to apply the 90 "operating ratio" in the manner described previously.

We hold the Commission was not legally prohibited from applying the 90 "operating ratio" in the manner it chose; indeed, appellants suggest no authority to the contrary except for an *a priori* contention that it was unreasonable in the circumstances. We believe, however, that there has been no showing of unreasonableness in that regard and much to show that the Commission's choice of method was reasonable. In substance, the 90 "operating ratio" *was* satisfied in terms of the *aggregate* expense and revenue expected of UPS' intrastate operations; it *was* satisfied in terms of the *average* or *typical* package expected to be handled in such operations; and, it *was* satisfied as to UPS' *nationwide* operations. With these general and particular assurances, we believe the Commission could reasonably conclude that the line-haul rates would produce a fair return and allow recoupment of UPS' expenses in its proposed intrastate operations; and, that it could reasonably conclude as well that uniform increments would suffice in lieu of the further and more minute distinctions demanded by appellants.

We do not conceive that the 90 "operating ratio" must be given the extended and procrustean-bed effect for which appellants contend. In substance, the method chosen by the Commission appears to be only a variation of the sampling technique specifically approved in the *Southern Pacific* decision mentioned above. We believe, moreover, that the choice to utilize uniform in-

crements was within the principle of *Railroad Commission v. Weld & Neville*, 96 Tex. 394, 73 S.W. 529, 533 (1903) (reasonableness of rates is determinable not from the rates assigned to each particular article but from the result produced by the carrier's overall business). For these reasons, we overrule appellants' point of error complaining of the line-haul rates.

## ACCESSORIAL CHARGES

The Commission's final order established certain other charges that must be paid and collected when certain services are provided by UPS in association with its transportation of packages: $.30 for proof of delivery; $1.90 for C.O.D. delivery; $1.90 for address correction and re-delivery; and, $3.25 per week for "automatic daily pickup call service." Appellants attack these sums as being unreasonable.

They point first to a Commission rule [4] requiring that "[a]ccessorial rates and charges" be set at a level that will cover the carrier's operating cost. 16 TAC § 5.148(b) (since repealed). Appellants contend the $3.25 charge for "automatic daily pickup call service" is unreasonable because it is *too low* to permit UPS to recover its costs associated with that service; consequently, UPS customers who do not subscribe to this service will subsidize those customers who do use the service. Conversely, the remaining accessorial charges are unreasonable because they *exceed* what is required for UPS to recover the costs associated with those services; consequently, those customers who use these services will subsidize those customers who use only the transportation services for which line-haul rates are paid. Therefore, such sums are said to be discriminatory to the extent one shipper class is required to subsidize another.

■ In the Commission's final order, the agency determined that the line-haul rates

---

**4.** *See* footnote 3, *supra,* for the text of the rule. The proposal for decision in the present case indicates that the Commission interpreted the rule as prohibiting "unfair cross-subsidies," while not always requiring "that each and every service charge cover operating expenses," under the principle of the *Weld & Neville* decision where the Supreme Court discussed the interplay of discrimination and reasonableness in the ratemaking context:

The fact that the carrier charged one person a greater sum [for the same class of freight over the same distance] was made prima facie evidence of unjust discrimination, but the carrier was permitted to rebut this presumption by *showing* that it was *not* unjust discrimination.... It will be observed that the violation of the law did not consist alone in the discrimination in charges, but depended upon the *justness of such discrimination....* Under the statute discrimination in rates is prohibited unless it appears not to be unjust or unreasonable. At common law the party complaining was required to show that the discrimination was unjust and unreasonable, while by statute the burden of proof was upon the carrier to establish that it was reasonable and just.

\* \* \* \* \* \*

The performance of [the Commission's statutory] duties requires that classification be made so as to secure equality *as near as may be* in the carriage of similar articles, and each shipper is entitled to have his property carried for a reasonable compensation for the service rendered to him [together with a fair return]; but in determining this question the railroad commission must have in view the entire business operations of the railroads. A marked difference between the right of the shipper and the carrier in determining the reasonableness of rates consists in this: When considered from the *shipper's* standpoint, it must be reasonable as to the particular property carried; that is, the charge must not be more than a fair compensation for the services rendered to the shipper in the carriage of the particular property. When, however, the commission considers the reasonableness of rates from the standpoint of the railroads, it is not confined to the particular article, but must look to the whole business of the railroads, which are required to carry many articles *at a loss* as a single transaction, which must be made up by levying *higher rates* upon such articles as can bear it *within the limit of reasonable compensation.* The rate and classification must be so arranged as to give a just and reasonable compensation on the entire business of the railroad company; but the rate on each article need not be reasonable if considered alone, but the aggregate must, however, produce a reasonable return....

73 S.W.2d at 531, 533 (emphasis added). Thus, Rule 5.148 is not reasonably interpreted as a straitjacket. The Commission's functions were intended to be far more complex in the Legislature's decision to employ a system of *official* rates, and it is quite clear to us that art. 911b delegates to the agency a commensurate measure of discretion so that the agency may actually and practically perform the duties assigned to it in that regard.

*and* the accessorial charges, *in the aggregate* and in view of the number of packages expected to be transported by UPS intrastate, satisfied the 90 "operating ratio" and enabled UPS to recover its costs and a fair return. Even if appellees conceded that any of the accessorial charges was unreasonable standing alone, this would not require reversal of the Commission's order. *Railroad Commission v. Weld & Neville, supra; Texas Alarm & Signal Association v. Public Utility Commission,* 603 S.W.2d 766 (Tex.1980). The principle that reasonableness must be determined in the context of the carrier's entire business does not, however, address the question of whether the Commission was bound by its own rule (16 TAC § 5.148(b)) to establish accessorial charges at sums sufficient to permit nothing more or less than a recovery of the costs associated with that service.

The Commission in its final order explicitly interpreted the applicability of § 5.148(b) in a way that was consistent with the principle of *Weld & Neville* and *Texas Alarm & Signal Association.* Consequently, the Commission interpreted § 5.148(b) contrary to the iron-clad effect produced by a literal reading of the rule. And the Commission also determined expressly that the purpose of the rule and the broad objectives of art. 911b, § 4(a) would be secured by reliance on the aggregate cost and revenue estimates and the "operating ratio" they yielded. The accessorial charges in dispute here were, of course, included in these aggregate amounts.

Appellants contend that § 5.148(b) had the force and effect of a statute so that it was binding on the Commission and this Court. Neither the Commission nor the Court are free to depart from what it explicitly requires: "Accessorial rates and charges shall be set at a level which will cover the operating cost of involved carrier or carriers as a group." *See Railroad Commission v. Beaver Reclamation Oil Co.,* 132 Tex. 27, 117 S.W.2d 52, 55 (1938). On that theory, appellants were not required to show prejudice by the Commission's departure from the rule and, indeed, none was shown. It is enough that each of

the accessorial charges is something more or less than the associated cost of providing the service.

We observe, however, that § 5.148(b) is only one of three provisions under the heading "Rate–Making *Standards.*" The entirety of § 5.148 is designed to achieve a general purpose—the setting of rates that are simultaneously "reasonable to the shipping public and compensatory to involved carriers as a group." This implies a balancing of objectives that contradict each other at either extreme. The wording and context of § 5.148(b) was intended to be a benchmark for the Commission and interested persons involved in the ratemaking process; that is to say, it was not intended to confer upon anyone an enforceable right for the purpose of regulatory estoppel. *See,* Raven–Hansen, *Regulatory Estoppel: When Agencies Break Their Own "Laws,"* 64 Tex.L.Rev. 1, 18–20 (1985). Consequently, the rule is not enforceable in the absolute and exact sense for which appellants contend; that is, the rule may not be given the construction expressly rejected by the Commission in favor of a construction that was in harmony with the principle of *Weld & Neville* and *Texas Alarm & Signal Association.* We hold the Commission was free to adopt this construction of a rule that it had itself promulgated and was bound to administer in a variety of circumstances.

 Even if we be mistaken in the foregoing, we believe the present case falls within the rule that the Commission, in applying such rule-based standards, must be allowed a reasonable margin for error in the actions it takes toward effecting a broadly stated statutory mandate, provided there is some basis shown in the record for concluding that the Commission is not merely exercising an unbounded and unshackled discretion. Railroad Commission v. Shell Oil Co., 161 S.W.2d 1022, 1027 (Tex.1942). We hold such a basis was shown in the various findings made by the Commission relative to the several accessorial charges, as discussed below. Finally, we conclude that the Commission's error in departing from the literal provisions of

§ 5.148(b), if error it was, was harmless because the whole of UPS' business conducted under the tariff was shown to yield a 90 "operating ratio."

In its final order, the Commission found as follows relative to the average "expense" (cost) of providing three of the accessorial charges:

| | Charge | Average Expense |
|---|---|---|
| "C.O.D. Delivery | 1.90 | 1.014 |
| "Address Correction and Re-Delivery | 1.90 | 1.171 |
| "Proof of Delivery | .30 | .241" |

Two of the variances from average cost figures were rationalized as follows: Concerning the charge for "C.O.D. Delivery," the Commission noted that the tariffs applicable to similar services provided by other carriers mandate charges ranging from $1.00 to $8.00 on up. Concerning the charge for "Address. Correction and Re-Delivery," the Commission observed that the $1.171 cost figure did "not include the costs of forms and the cost of mailing address corrections." The Commission's final order does not set out any rationalization for the "Proof of Delivery" charge of .30; we note, however, that it substantially complies with the 90% formula.

The Commission also established in the tariff a fourth accessorial charge under the heading "Automatic Daily Pickup Service." For the weekly sum of $3.25 paid by a customer, a UPS employee must appear each day at the customer's residence or place of business to receive any packages the customer may wish to ship that day. In connection with this tariff charge, the Commission made or adopted these findings: UPS would make about 30,000 such appearances each day in Texas, thereby incurring an average expense of $0.0820 and earning an average revenue of $0.97 for each package received. The company would derive each year an estimated $97,-500 from its "Automatic Daily Pickup Service" and incur associated costs equal to $82,440, which sums result in an "operating ratio" of 84.6. The Commission also determined that only one such weekly charge would be required of a customer, whether he shipped intrastate or interstate or both (interstate shippers presently pay

for the service); that the weekly charge of $3.25 covered only the cost of appearing at the customer's residence or place of business (and not the cost of handling packages or transporting them, which costs were recoverable under the company's line-haul rates); and, that the "Automatic Daily Pickup Service" benefitted the shipper (who was saved the trouble and expense of taking his packages to a UPS terminal) and the carrier (which was saved the cost of preparing shipping documents, computing the pertinent charges, estimating the weight of the packages, and other unidentified work).

We hold the foregoing show a rational factual basis for departing from the literal requirements of § 5.148(b) and for the sums established for the four accessorial charges.

Concerning the "Automatic Daily Pickup Service," appellants make two additional arguments. They contend the charge for that service should not have been promulgated as an accessorial charge at all; rather, UPS should have been required to provide the service and recoup its associated costs and fair return through the medium of its line-haul rates. We hold the choice was within the discretion of the Commission and reasonable because the daily calls were to be made by UPS employees whether or not the customer shipped a package. Appellants also contend the weekly charge for this service discriminates unreasonably against low-volume shippers because they are forced to subsidize high-volume shippers. We hold the convenience to both groups reasonably justifies the Commission's decision, when the calls may or may not result in the actual carriage of freight, as stated in the agency's final order.

Accordingly, we overrule appellants' points of error complaining of the accessorial charges promulgated by the Commission in its final order.

## THE COMMISSION'S CHOICE OF EVIDENCE

■ In proving the likely expenses and revenues resulting from its proposed intra-

state operations, UPS adduced evidence showing the expenses and revenues associated with the *Texas portion* of its interstate carriage of packages and with its exempt-zone operations in Texas. From this segregated portion of the company's system-wide expenses and revenues, the Commission predicted the company's expected expenses and revenues in its new intrastate operations. Appellants contend the Commission should have based its estimates on the company's *nation-wide* expenses and revenues, reasoning from these more general figures to the more particular Texas predictions. In not doing so, appellants say, the Commission acted arbitrarily and capriciously, and the resulting rates are unreasonable.

We cannot find that the choice of evidence made by the Commission was prohibited by any statute or rule. It appears to us that the Commission had discretion to use either body of evidence as a basis from which to infer the anticipated expenses and revenues associated with UPS' new intrastate operations. *See, e.g.,* art. 911b, § 22c; *Texas and New Orleans Railroad Co. v. Railroad Commission,* 155 Tex. 323, 286 S.W.2d 112 (1955). While either choice might furnish an argument to a dissatisfied party, such a dispute actually relates solely to the weight of the evidence—a matter peculiarly within the Commission's special authority, knowledge, and experience to decide. We may not say that the choice of either body of evidence would have made the resulting rates unreasonable as a matter of law, as appellants must contend. We therefore overrule appellants' point of error.

## DISCRIMINATION AMONG SHIPPERS BASED UPON THE ZONE SYSTEM

Appellants contend that little correlation exists between the destination zones set by the Commission and the actual distance packages may be transported, due to the fact that only the first three digits of the applicable "zip codes" were used in calculating the zones established in the tariff. Since mileage is a key determinant of the line-haul rates, appellants argue, a more accurate zoning system should have been

used in order to avoid the resulting discrimination among shippers.

Appellees rejoin that the zones chosen by the Commission are reasonable because: (1) the primary competitive relationship at issue exists between UPS and the United States Postal Service; and, (2) any discrepancies are minor and within the rule of reasonableness because the resulting "overlap" is only 17%, compared to an "overlap" as great as 67% in some existing tariffs, which tariffs are presumed to be fair and reasonable and apply to some of the opposing carriers themselves.

We believe and hold that the differences referred to fall within the principle of the *Weld & Neville* and *Texas Alarm and Signal Association* decisions, *supra.* This inexactitude was within the scope of reasonableness, given the circumstances of the case and the evidence adduced.

## UNFAIR AND RUINOUS COMPETITION

Some of the appellants contend the rates and charges are unreasonable because the Commission entirely refused to consider, in their promulgation, the ruinous effect the UPS tariff would have on *their* operating ratios and, hence, their continued service to the public as part of an integrated intrastate transportation network. Consideration of this effect on the industry is, of course, one of the fundamental legislative purposes behind the State's regulation of motor carriers.

Appellees rejoin that the issue raised by appellants is properly considered only in the licensing of motor carrier operations and not in the ratemaking context, citing art. 911b, § 8. We disagree with this simplistic view, believing that the legislative purpose is a proper consideration whenever such a purpose is shown to be applicable in any Commission proceeding. *Oil Field Haulers Ass'n v. Railroad Commission, supra.* This does not mean, however, that the Commission is entirely without flexibility in the matter, and it apparently *did* address the competitive effects of the UPS tariff in the present case.

**144**

In its findings of fact, *for example,* the Commission distinguished between the "regular" or fixed routes under which competing carriers operate and the manner of operation proposed by UPS; it enforced the traditional 90 "operating ratio" with its inherent effect of aligning all carriers on approximately the same estimated rate of "fair return" plus a recoupment of operating costs; and, it viewed the case as one where UPS' primary competitor is the United States Postal Service (and not other carriers) in view of the limited range and types of packages UPS is permitted to transport and the company's authorized manner of operation. We are, therefore, unable to agree with appellants' factual postulate that the Commission refused entirely to consider the effect the UPS tariff will have on competing carriers. Consequently, we overrule the point of error.

### THE COMMISSION'S FAILURE TO MAKE FINDINGS PROPOSED BY APPELLANTS

Appellants contend the Commission erred in failing to make certain findings of fact proposed by them, or to rule on their proposals in that regard, citing APTRA § 15.

We find, however, that the Commission's final order declares that the agency *did* consider each proposed finding submitted by appellants, that it expressly declined to adopt them, and that they were expressly overruled. We do not find in APTRA § 15 the legal effect for which appellants contend in arguing that the Commission was bound to adopt the findings of fact proposed by appellants.

Finding no error as assigned by appellants, we affirm the judgment of the district court.

BRADY, J., not participating.